(No. 22561.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN L. MINZER, Plaintiff in Error.

*Opinion filed October 24, 1934—Rehearing denied Dec. 13, 1934.*

SHAW, J., dissenting.

NORTHUP & BEARDSLEY, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURT-NEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, J. ALBERT WOLL, and HENRY E. SEYFARTH, of counsel,) for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

John L. Minzer, plaintiff in error, (hereinafter called defendant,) prosecutes this writ of error to review a judgment of conviction of murder entered by the criminal court of Cook county upon the verdict of a jury finding him guilty. He was sentenced to the Illinois State Penitentiary for twenty years. The seven counts of the indictment severally charged that he murdered Amelia Sailly Emmonse (otherwise called Amelia Emmons Sailly and Jerry Emmons) by choking and strangling her, by tightening a belt around her neck, by tightening a tie around her neck, and by constricting her neck with his hands and fingers.

The record shows that Mrs. Emmonse occupied room 312 in the Harper End Hotel, in Chicago, (hereinafter referred to as the hotel,) from February 16, 1933. Wilson Boyd, the manager of the hotel, testified that he had seen the defendant three or four times and knew him prior to February 21, 1933. On that evening, about 6:00 o'clock, he saw him going up-stairs in the hotel. About 2:45 o'clock in the morning of February 22, 1933, the night clerk, after two or three requests had been made from room 312 for the police, called Boyd's room and asked him to go to that room. When Boyd entered the room he found Minzer leaning against the wall. His eyes were glassy and he was somewhat unsteady. The body of Mrs. Emmonse was

lying diagonally across the bed with the covers over her lower limbs. A dark necktie with a white figure in it was bound around her neck. She had on a dark street dress and no shoes and stockings. The room was not in disorder and the pillows on the bed were in their place. Nothing was overturned. Boyd's room was about fifteen feet away. He had heard no screams, noise or scuffling. These facts are corroborated by other witnesses for the People. They are not disputed by defendant's witnesses.

In answer to Boyd's question as to what had been the trouble, defendant said, "She asked for it and I gave it to her." When asked what he meant, he said, "She wanted to die and I killed her." Similar admissions in varying language were made later that night in room 312 to various police officers and to Dr. Donald Ronsler. On the trial, objections to the competency of this evidence on the ground that Minzer was in such a state of intoxication that he was not capable of making an admission against interest at the time were overruled. There is no proof that these admissions resulted from any improper conduct toward defendant. The proof shows, on the contrary, that he made the statements freely and when under no restraint and that no promises or inducements were made to cause him to make these admissions. In addition to Dr. Ronsler, Wilson Boyd, William Tapscott, Jeremiah C. Vaughan, Redmond P. Gibbons, Francis Guy and Edward Barry, police officers, testified to similar statements made there that night by Minzer. The making of these statements is not denied.

Over the same objection, and an additional one that his testimony concerned an inadmissible statement made by Minzer at the police station, officer Edward Barry testified that Minzer said to him there in room 312 in the hotel that night, "She gave me syphilis and told me she was pregnant, and I would rather see her dead than have a baby." No effort was made to controvert these statements to Dr. Ronsler and other witnesses who were present in room 312

before the body was removed and while Minzer was present, or the facts that a necktie was bound around Mrs. Emmonse's throat, twisted, the ends pushed under the tie, and that her face and neck were red or purple and swollen when the body was found. There was a bruise on the right side of her neck and there were three or four scratches on its left side.

It was shown by the testimony of officer William A. Maas that he and another officer took the body of Mrs. Emmonse from room 312 to the County Hospital, where they delivered it to James Healy on the morning of February 22, 1933. Healy was the keeper of the morgue at that time and was identified in the court room by Maas. It was also shown that Healy tagged the body for identification and made out the proper notification to Dr. Jerry Kearns that an autopsy was to be performed on that corpse. It was further shown by an undertaker, Arthur Roberts, that on receipt of a telegram that day from Mrs. Emmonse's father he took this telegram and presented it at the county morgue and received a corpse upon which an autopsy had been performed, and later on the same day Frances Zuzby, a sister of Mrs. Emmonse, identified the body at Roberts' undertaking establishment as that of Mrs. Emmonse. Dr. Kearns described an old bruise on Mrs. Emmonse's right leg. This corresponded with that described by Dr. Petit, a witness for the defense, who had treated Mrs. Emmonse after a fall a few days before her death. The objection to Dr. Kearns' testimony that he performed an autopsy on the body of Mrs. Emmonse was properly overruled.

Dr. Jerry Kearns, a pathologist in the coroner's office, testified that he performed the post-mortem examination on the body of Mrs. Emmonse on February 22, 1933, in the post-mortem room at the county morgue. He described the objective symptoms found. He detected an odor of alcohol in the viscera, but did not detect this odor in the brain sufficiently to require chemical analysis of the brain

for alcohol. He removed the brain and sent the stomach contents, kidneys and half the liver to the coroner's chemist, Dr. Muehlberger, for analysis for alcohol and poisons. He described three abrasions of the skin on the left side of the neck and scratch marks and a bruise on its right side. He said: "In addition to engorgement of the lining of the mouth, tongue and esophagus there was engorgement of the veins and muscles of the neck. Alcohol causes engorgement of other organs by causing heart failure. There was no evidence of heart failure. It was a practically normal heart. I eliminated alcoholism as a cause of death because the myocardium of the heart was in good physical condition. I ordered the toxicologist to make an examination in this case. * * * I mean the cause of all this congestion and engorgement started from the neck or was caused by neck strictures and strangulation." He also said: "My opinion as to the cause of death is based partly upon the marks on the neck and partly upon the engorgement of the organs of the neck. With the exception of the heart, pathological conditions from alcoholism are practically the same as the pathological conditions from trauma. We do not get congestion of the neck with acute alcoholism."

The defense witnesses were Edmond Hartman, Myrtle Erickson, Dr. McNally, Dr. Muehlberger, the coroner's chemist, Dr. Petit, and the hotel manager, Boyd.

Myrtle Erickson and Edmond Hartman testified, in substance, that they had been with defendant and Mrs. Emmonse in her room on the night of her death. Previously they had been together frequently. All of them were drinking that night. Miss Erickson and Hartman said Mrs. Emmonse took several drinks. The last two were gin she poured for herself. They described a low-toned conversation between Minzer and Mrs. Emmonse. They heard enough to know that she was urging Minzer not to leave her. Hartman said that the same sort of disputes had occurred between Minzer and Mrs. Emmonse

for about two months. Minzer was tired of Mrs. Emmonse, although she was apparently fond of him. He slapped Mrs. Emmonse with his open hand that evening. Later he caught her by the throat, but left off choking her when Hartman interfered at Miss Erickson's request. Miss Erickson said this was while Mrs. Emmonse was sitting on the bed, and that she appeared all right later. Only a slight red mark appeared on her throat similar to that left by a slap. Minzer also pushed Mrs. Emmonse back on the bed when she wanted to restrain him from going when he and Hartman left the hotel. Before she left, Miss Erickson removed Mrs. Emmonse's shoes and stockings and put the bed covers over her.

Dr. McNally, an expert, testified that in his opinion Mrs. Emmonse's death could have been caused by alcoholism. He showed the importance of an examination of the brain, where acute alcoholism is suspected, under his theory of such cases. He testified in detail as to the effects of alcohol upon the various organs of the body. The coroner's chemist, Muehlberger, testified as to the percentage of alcohol found in Mrs. Emmonse's stomach contents, liver and kidneys. He had received them from Dr. Kearns. The hotel manager, Boyd, testified for the defendant that Mrs. Emmonse was despondent and had talked to him of suicide.

Proof of the *corpus delicti* is questioned by defendant: When a doctor examined Mrs. Emmonse's body in her room Minzer was present and she was dead. He stated voluntarily there several times that he killed her. The testimony shows she died as a result of violence, and aside from Minzer's admissions and the testimony of Dr. Kearns that death was due to strangulation, the circumstances in evidence establish that Minzer choked her to death with his hands and fingers. The *corpus delicti* was proved.

The point is urged that when Minzer admitted in room 312 that he had "killed" Mrs. Emmonse he did not neces-

sarily mean he had taken her life. The defendant is shown to have been drinking, but he knew what he said and he understood the questions asked of him there. He told many people that he killed Mrs. Emmonse, that she was dead, that he hoped she was dead, and used many different methods of expressing this idea. The necktie, the bruises, the congested neck, face and brain are mute evidence of the murder.

The defendant suggests that one Meyers, who occupied an adjoining room and used the bath-room that served room 312, might have killed Mrs. Emmonse after the other three people had left her room. But the testimony shows that the door from the bath-room to room 312 was locked when the police came. There is no evidence to the contrary. This argument is purely speculative and is without weight.

Defendant complains that the trial court erred in its rulings on the evidence. He says it was error for the court to permit Dr. Kearns to testify that in his opinion the death of Mrs. Emmonse was caused by strangulation. He relies upon *People* v. *Rongetti,* 338 Ill. 56. All that can be said of the evidence on behalf of the defendant as to the cause of death is, that by it he sought to show that there were objective symptoms which may be found where death is due to acute alcoholism. None of his witnesses denied the fact that the deceased had been strangled. In cases where there is no dispute as to the manner and cause of the injury and no dispute that there was an injury sustained by reason of the acts of which complaint is made, this court has held that a physician may then directly testify that a later malady was or was not caused by the accident or original injury, upon the same principle that he may testify that death resulted from a certain wound. (*Schlauder* v. *Chicago and Southern Traction Co.* 253 Ill. 154; *City of Chicago* v. *Didier,* 227 id. 571.) There was no uncertainty or denial of the fact that a necktie was

bound around the neck of the deceased when her body was found, or of the fact that her neck showed bruises and abrasions, or of the congested condition of her neck, face, tongue and brain. Where, as here, it is not denied that these symptoms were present and that they result from and accompany strangulation, the case presented does not differ, in principle, from that presented where the body of the deceased reveals a mortal wound the fact of which is not denied. In this state of the record the trial court did not err in permitting Dr. Kearns to testify that in his opinion death was due to strangulation.

Defendant claims that the court erred in refusing to permit Dr. McNally to testify, as an expert, as to what might not or could not cause the death of Mrs. Emmonse. The record does not bear out this contention. The court did sustain an objection and allow a motion to strike an answer which Dr. McNally gave to the question, "Do you care to explain your answer—give your reason for your answer?" This question followed the witness' statement that in his opinion the condition of hyperemia of the organs could have been caused by alcohol. By the answer, which was stricken, the witness excluded the necktie as a cause of death and excluded some other objective symptoms but was permitted to testify at length as to the effects and symptoms of acute alcoholism. He was also permitted to testify that in spite of his studies and research, which formed the basis of scientific articles he had written on the subject and in which he expressed a contrary view, it was his opinion that only from the brain could an accurate chemical examination be made to determine whether an individual had died from excessive alcoholic indulgence. Under these circumstances defendant was in no way prejudiced by the court's ruling.

The argument is untenable that officer Barry should not have been allowed to testify to what Minzer told him freely and without a promise or a threat or any other inducement

in room 312 on the night in question. It is claimed that since no other person testified to this statement about Mrs. Emmonse giving Minzer syphilis, being pregnant, and that Minzer would rather see her dead than have a baby, as set out above, officer Barry must have got this information at the police station where the signed statement of Minzer was taken, which latter statement was held incompetent. The statement made in room 312 of the hotel under the circumstances in evidence was admissible. The objection goes to the weight of the testimony and not to its competency.

Minzer was drinking and was under the influence of alcoholic beverages on the night of February 21, 1934. He argues that his condition was such that his acts make the killing of Mrs. Emmonse manslaughter instead of murder. *People v. Cochran,* 313 Ill. 508, is cited in support of this contention. In that case, at page 519, we said: "From an examination of the authorities in this and other States we are of the opinion that the true rule is, that where intoxication is so extreme as to suspend entirely the power of reason and the accused is incapable of any mental action he cannot be convicted of any crime which involves intent or malice, but that he can be convicted for committing, while in such state of intoxication, a crime which consists only of the doing of acts which are prohibited by law and in which intent, deliberation or malice is not an element." The testimony as to Minzer's condition and the facts and circumstances do not bring him within the rule as stated in that case.

The complaint is made as to the twenty-second given instruction that it attempts to define malice aforethought, that it ignores defendant's state of extreme intoxication, and that it stated that murder can be committed by choking, strangling, or by any other means by which human nature may be overcome. The last point is said to include giving gin to the deceased. This instruction did not direct

a verdict and it was merely definitive. A careful examination of it does not impress us with the criticism leveled against it, and we therefore hold that there was no error in giving it, so far as such objections to it are concerned.

The twenty-third given instruction is criticised because it told the jury that malice includes not only anger, hatred and revenge, but every other unlawful and unjustifiable motive. No explanation of this objection is given. It is said that the inconsistency is at once apparent in this instruction in the light of this record. No inconsistency is apparent to us. In *People* v. *Lucas,* 244 Ill. 603, an instruction of similar import was held to be good.

The complaint as to the twenty-fourth given instruction is, that by requiring the jury to find the act of Minzer flowed from malice if he deliberately and cruelly assaulted the deceased, however sudden the assault was, error was committed. It is claimed that the instruction directed a verdict in so many words, (which it does not do,) and that it totally ignored the defense of alcoholic dementia. This is the first reference to this particular mental disorder shown by the record, abstract and briefs, and it is not the defense that was attempted to be made by Minzer. His claim was that he was so intoxicated that he was incapable of mental action—not that he was mentally deranged. The instruction is not subject to the criticism made of it.

The thirtieth instruction is criticised because it states an abstract proposition of law and leaves out of account manslaughter arising out of dementia caused by strong drink and the resultant mental incapacitation. It is evidently the thought of counsel for defendant that the question of provocation was not at issue, but the People were warranted in believing it was by the evidence produced for defendant as to the quarrel or altercation between him and Mrs. Emmonse in room 312 at the hotel before Hartman, Minzer and Miss Erickson left.

Two objections are made to the thirty-first given instruction. The second is that it is confusing, and the first objection is that because drinks were had at Mrs. Emmonse's room some juror might think that this constituted at the time an unlawful act, and that therefore Minzer was guilty of murder because he gave Mrs. Emmonse a drink of liquor. There is no evidence that he did give her liquor. There is evidence that she took two drinks of gin which she poured for herself and evidence that she had other drinks. This objection appears frivolous and is not well taken. Neither is that which claims the instruction is confusing.

We have read the argument of counsel for the People and are not of the opinion that the jury were in any way aroused thereby to passion or prejudice. The verdict of guilty was warranted, and the punishment fixed at twenty years' imprisonment is the best proof that the jury were not inflamed by any remarks counsel made.

It is argued as a final point that the State's attorney's office suppressed certain evidence, viz., neckties from Mrs. Emmonse's room and a bottle of gin which was there before the officers arrived on the night in question. The judge who tried the case offered to issue a *subpœna duces tecum,* and counsel for the People offered to produce the inventory of what articles were taken. Defense counsel did not avail himself of these offers.

The record in this case is long and the witnesses were many. It is seldom that a perfect record is brought to any court of review, and this one is no exception. There is, however, no error in this record that would warrant a reversal of the judgment of conviction. The defendant's guilt of murder as charged in the indictment is established beyond a reasonable doubt, and the judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE SHAW, dissenting.