(No. 29151.— ▆▆▆▆▆▆▆▆▆▆▆

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN FEDORA *et al.*, Plaintiffs in Error.

*Opinion filed January 23, 1946—Rehearing denied March 14, 1946.*

166

Fleming & Cochran, of East St. Louis, (Richard M. Stout, of St. Louis, Mo., of counsel,) for plaintiffs in error.

George F. Barrett, Attorney General, and Ivan J. Hutchens, State's Attorney, of Decatur, (Roy B. Foster, and Kenneth E. Evans, both of Decatur, of counsel,) for the People.

Mr. Justice Fulton delivered the opinion of the court:

The plaintiffs in error were indicted in the circuit court of Macon county, at the October term, 1930, for the murder of Abel F. Price. They were tried by a jury in that county and were found guilty and punishment of each defendant was fixed by a jury at imprisonment in the penitentiary for life. Motions for a new trial and in arrest of judgment were overruled and sentence was imposed by the court on February 18, 1931. A bill of exceptions was filed on May 14, 1931. This writ of error was sued out to the September term, 1945, of this court. Because one of the assignments of error is that the evidence was insufficient and that the verdict is contrary to the manifest weight of the evidence, it will be necessary to make a rather detailed review of the evidence.

On the night of December 4, 1930, Abel F. Price was employed by the Illinois Power and Light Company in the city of Decatur as a bus driver. On this night he drove a bus on East Condit street to the Twenty-second street viaduct and at that point turned the bus around for the return

trip to the city of Decatur. Condit street runs east and west; Twenty-second street runs north and south. Just west of the main Twenty-second street viaduct is a short street known as Little Twenty-second street. Gabriel's restaurant was located on the corner of Condit and Little Twenty-second streets.

Edward L. Manning, a witness for the People, lived on Little Twenty-second street in the third house north from Gabriel's restaurant. At five minutes of nine on the evening in question, Manning went to bed. Just before that he saw a black Ford coupe drive under the viaduct at Twenty-second street and turn off the lights. It was a brand new late model one-seated car and it looked like it was blue or black. Manning had just dropped off to sleep when he was awakened by someone shooting and he went to the front door of his home. When he reached the door, he saw a Ford coupe coming out from under the viaduct and the coupe headed north. As the car started north, a man came running from the direction of Gabriel's restaurant and ran in front of Manning's house. The car at that time was directly in front of Manning's house. The man ran alongside of the coupe and jumped on the running board and fired two shots towards the south and in the direction of where the bus was located. He then got into the car and drove north on Little Twenty-second street to the main Twenty-second street. Twenty-second street runs north and in one-half mile comes to a road running across Stevens' creek. There were no lights on the car as it drove away. Manning then dressed and went west on Condit street to the office of the Wabash railroad shops. The bus had stopped in front of the shops on the north side of Condit street, and Manning saw some men place Abel F. Price, whom he had known as a bus driver, in an ambulance. Manning described the man who did the shooting as about five feet four inches in height and weighing about one hundred forty pounds.

Virgil E. Richardson testified that he was a patrolman for the Wabash railroad company and was on duty in the car shops' yards just east of the viaduct at Little Twenty-second street on this night; that at about ten minutes after nine o'clock he saw a new dark model "A" Ford coupe stop underneath the viaduct and the lights turned off and saw a man get out of the coupe on the right side and walk behind a pier underneath the viaduct and wait there until the bus turned around. He further testified that after the bus turned around and started west the man ran from behind the pier and whistled two or three times and the bus stopped. He heard shots fired and saw a man run around the corner of the restaurant toward the car. As the car was driven north, Richardson fired two shots at the moving car. He testified the man who did the shooting was about five feet four or five inches tall and that he was kind of a slender fellow and had on an extra long overcoat. Richardson was about one hundred feet away from the car and to the southeast of it when he shot, and he fired a .38 Smith & Wesson revolver with lead bullets.

W. A. Jones, who lived at the corner of Condit and Twenty-second streets, near the Twenty-second street viaduct, testified that he was in bed on the night in question when he heard someone holler he was shot. He got out of bed and went to the door and saw a man about five feet five inches in height running north in front of his house about in the center of the street, which is eighteen feet wide, and saw a new Ford coupe come from underneath the viaduct on Little Twenty-second street and drive northward. There were no lights on the car and he saw the man run alongside of the car and get in on the left side and shoot back again after he got on the running board. He was shooting back south. The lights on the viaduct throw light onto Twenty-second street. He heard about five shots by both parties and heard two after he went to the door. He went down to the Wabash office and saw

Price brought out on a stretcher and being put into the ambulance. It was about a quarter after nine on that night that he heard the shot.

Arthur Dodwell, a witness for the People, and who was a laborer for the Wabash railroad and twenty-seven years of age, testified that he had known the two defendants for about ten years and saw them together on the evening of December 4, 1930; that in the afternoon of that day the defendant, John Fedora, asked Dodwell to rent a car for him from the Saunders U-Drive-It-Yourself system and that Dodwell rented a Ford coupe from the Saunders agency for Fedora and Laska and delivered it to Fedora before six o'clock that evening. Fedora said to be at Laska's house around five o'clock and Laska would give him the money to get the car. He drove to Laska's house with Fedora about five minutes after five o'clock. Laska gave him five dollars to pay for the car and said he wanted a Ford coupe. Dodwell rented the car and gave a five-dollar bill as a deposit, and then Laska and Fedora got into the car and Dodwell told them to meet him at nine o'clock at Central Park so that he could get the Ford and return it to Saunders. Laska testified that Dodwell and he had a conversation as to where Laska would meet him and that Dodwell told him to meet him at nine o'clock and where to meet him. Dodwell then got out of the Ford coupe and into his own car and he did not see them again until about eleven-fifteen, when they came to where he was parked in his car. Elizabeth Heckler and Laurence Heckler were with him during that time, and he was at the meeting place at nine o'clock and remained there until defendants came. When the two defendants arrived, they told Dodwell to follow them and they all drove out across the lake to Homer Neal's place, where they remained drinking beer, which was bought by the defendants Laska and Fedora, until about three o'clock the next morning. After they left the Homer Neal home, Dodwell took Miss Heck-

ler to her home and left his car at his home and got into the rented car with the defendants and all three of them drove out in the country to Stevens' creek. Laska told him he got hold of a newspaper and read where an Illinois Power and Light Company bus driver was shot and in a critical condition. Laska also testified that he had talked to Dodwell at Stevens' creek and said he had seen in the paper where the Jasper street bus driver was shot three times and was in a critical condition. The defendants told Dodwell they got in a tight place and the car had been shot at and they told him to look at the car. He testified he found a dent above the back fender on the right-hand side of the car. Dodwell further testified that the defendants told him the shooting took place at the Twenty-second street viaduct and the defendant Fedora said that he, Fedora, shot him. Dodwell further testified that they slept in the car along Stevens' creek for a while and then went to the home of Arthur Schwartz at 2552 North Union street in Decatur and there obtained a hammer and stove shaker and pounded out the dent in the car and that Laska smeared black paint on the dent in the car with his fingers. The defendants admitted on the stand that they were at Stevens' creek on the night in question and that they slept there part of the night. When they left the Schwartz home, Dodwell testified that Laska told him not to say they had been at Schwartz's home that morning, and further told Dodwell not to say he was with a girl or that he had gone up town with him after the car.

Arthur Schwartz testified that he lived at 2529 North Union street, Decatur, Illinois, and had known the defendants for about ten years; that they came to his home about seven o'clock on the morning of December 5, 1930, with Dodwell in a Ford model "A" coupe, which they said was a borrowed car and they borrowed a hammer and stove shaker from him, the hammer belonging to Laska and hav-

ing been left there two or three weeks before. He also testified he saw a shiny place on the right side of the body of the car above the rear fender. He further testified that Laska told him to forget that he saw him. His wife, Hazel Schwartz, testified the defendants were at her home in the early morning of December 5, and they came there in a dark Ford coupe.

The manager and an employee of the U-Drive-It-Your-self agency, which owned the Ford coupe driven by the defendants, testified the coupe had a dent in it on the right-hand side of the body above the fender approximately eighteen inches back of the door and approximately four inches down from the bead of the body and about six inches above the fender and was approximately the size of a quarter and that fresh paint had been smeared over the dent. He rubbed the paint off and it was fresh. At the base of the dent, the top part of it was still shiny and it was about the size of a dime and was round. There were no other dents or scratches on the car. The witness Borden testified that there was one man with Dodwell when the car was returned at eight-fifteen A.M. on December 5, and the mileage on the car showed 101 miles since it was taken out.

The defendants testified the dent in the car was caused by their bumping into a truck which was parked on an angle in the streets in Decatur, but in rebuttal the People proved that when John Laska was questioned at police headquarters he said he did not know anything about the dent on the car. Laska admitted that he told the police that he did not know anything about this car having been fixed up and the paint put on. The People also proved in rebuttal that the defendant Fedora when questioned with reference to the dent in the car said he did not know anything about it. Both defendants admitted that Dodwell rented the car for them and corroborated Dodwell in many

particulars. Laska testified he knew Price and had ridden on his bus and that he had known Fedora for eight years and Dodwell for about twelve years.

Charles Matthews found a money-changer in the waters under the bridge across Stevens' creek and turned the same over to the police. This was identified and admitted into evidence, and the cashier at the transfer house of the Illinois Power and Light Company stated she saw Price at the transfer station on the evening of December 4, shortly before nine o'clock, and that he had a money-changer on him.

Laurence Heckler testified that he and his sister, Elizabeth Heckler, knew the defendants Laska and Fedora and also Dodwell and that they were with Dodwell on the evening of December 4, from seven o'clock to nine o'clock, parked in Dodwell's car on Water street.

Dr. Arthur F. Goodyear, who had been Price's physician for many years, testified that he examined Abel F. Price about nine-thirty on the evening of December 4, 1930, at the Decatur and Macon County Hospital, and found that Price had been shot three times, one a superficial wound through the right arm, the second a superficial wound through the left thigh, and the third wound from a bullet entering in the middle of the tenth rib on the right-hand side between the midaxillary and anterior line. It was right over the liver. The patient was in a condition of severe shock and the doctor had to administer stimulants and thought he would die then. The doctor, assisted by Dr. Walter Murfin and a registered nurse, performed an abdominal operation and found the bullet had penetrated the peritoneum of the abdomen. The instrument with which he probed for the bullet and his other instruments were sterilized. The superficial wounds were first treated septically. Price was operated upon about eleven-thirty. At the time of the operation, the peritoneum covering the large bowel was inflamed and red for about four inches,

and there were a few flakes of coagulated blood in the abdomen. No evidence of the perforation of the bowel was found. The mesentery, a fanlike tissue that holds the small bowels, had been punctured in two places. Price requested that his appendix be removed as he had had trouble with it. It was a chronic type rather than acute, and it was removed at the time of the operation. Price responded well from the operation and for the first three days his general condition was good. Then he began suffering from abdominal distension and began to vomit and was unable to have proper bowel action. Peritonitis developed and he became worse and died about ten o'clock on the morning of December 11. Dr. Goodyear testified that Price's death resulted from peritonitis and that the peritonitis was caused by a gunshot wound in the abdomen. Dr. Goodyear was unable to find the bullet in his probing and did not probe longer as he was afraid that it might have pierced the liver. The doctor testified the inflamed condition of the colon was caused by a foreign body injuring the surface of the bowel and peritoneum, and that the injury on the colon spoken of was right by the trail of the bullet that went in there, and that the bullet caused it.

When the bus which had been driven by Price was brought to the garage, one of their employees lifted the small light cushion which Price used on the driver's seat, and there was a hole in the seat. He reached into this hole and extracted a bullet, which was later turned over to the officers and offered in evidence.

A post-mortem examination was performed by Dr. Milton G. Bohrod in the presence of Dr. Goodyear. Dr. Bohrod was one of the witnesses called by plaintiffs in error. A bullet was found during the post-mortem in the outer curvature of the right kidney. He testified on behalf of the defendants that he was a pathologist at the Decatur and Macon County Hospital, and that the entire lines of the abdominal cavity, both the outside walls and the part that

covers the intestines, were covered by flakes of material resembling pus; that the bowels were distended from gas and that there were no perforations through the intestines through which the gas accumulating inside could have gotten out, and there was no opening at the site of the removed appendix where he cut the sutures; that the right kidney was buried in a mass of tissue which, on opening, contained some clotted blood and there was a craterlike depression about one-half inch deep and about three-eighths of an inch across the right kidney in the upper portion where the bullet had apparently lodged, and when he lifted the kidney the bullet fell from beneath the capsule. Dr. Bohrod stated, in his opinion, it was impossible to tell whether the peritonitis which he described resulted from a gunshot wound or from the operation for appendicitis. On cross-examination he stated there was a clot of blood and some serum and some destroyed tissue of the kidney at the point where the bullet was imbedded; that there were two openings of the peritoneum, one in the part of the abdomen above the level of the right rib, and the other behind or right over the right kidney; that the right peritoneum was affected and was rough and covered with flakes of what looked like thick pus and the loop of the bowels was covered in the same manner, and, in his judgment peritonitis might have resulted from the punctures of the peritoneum or that the peritonitis might have resulted from the wound at the point in the kidney where the bullet was found. He further stated that penetration of the peritoneum by any foreign substance was apt to cause peritonitis. His conclusion was that the man died from peritonitis, but he was unable to tell by his post-mortem examination what caused the peritonitis.

The defendants denied killing Abel Price. They offered evidence to the effect that they were at Warrensburg between eighty-thirty and nine o'clock on the night in question. These alibi witnesses for the defendants fixed the

time either by guess or by the time a train passed through the village. Defendants' witness Hardy had never seen the defendants before that evening, and defendants' witness Albert, who operated a restaurant in the village, did not remember hearing the train coming through and did not observe the time and said he was not positive of the time the defendants were in his restaurant but thought it was between eight and nine somewhere.

The People's witnesses testified they saw the defendants at Warrensburg between ten and eleven o'clock on that night. The operator of the pool hall testified that Laska and Fedora played pool in his place and paid for three games in dimes and that they left before fifteen minutes to eleven, and one of the two defendants asked him to give him a dollar bill for two quarters and five dimes, and his helper testified they were there for three quarters of an hour playing pool and the slot machine, and that they gave him two dimes. While they were drinking beer at Neal's, they paid for the beer in small change.

Four witnesses testified on behalf of the defendants that Dodwell's reputation for truth and veracity was bad and they would not believe him under oath. Plaintiffs in error advance five reasons upon which they rely for reversal.

They first contend that their conviction rests upon circumstantial evidence which is insufficient to support it, and further that their conviction resulted from passion and prejudice and not from a considered deliberation of the evidence.

The record in this case consisted of four hundred ninety pages of testimony. We have reviewed in this opinion the principal part of the evidence and will not here repeat it. It is our opinion that the testimony shows the guilt of the defendants beyond a reasonable doubt and that the jury was fully justified in its verdict.

While it is true that much of the evidence on behalf of the People was circumstantial, nevertheless, we have held

that circumstantial evidence is legal evidence and that there is no legal distinction between direct and circumstantial evidence so far as their effect and weight are concerned. (*People* v. *McDonald*, 365 Ill. 233; *People* v. *Francis*, 362 Ill. 247.) Also, that where circumstantial evidence is strong and convincing in character, it is sufficient on which to base a conviction. (*People* v. *Norris*, 362 Ill. 492.) And in *People* v. *Schanda*, 352 Ill. 36, we held that in a murder case the *corpus delicti* consists of the fact of death and the criminal agency of another person as the cause of death, and that where it is the best evidence obtainable, the *corpus delicti* may be shown by circumstantial evidence.

In the instant case the fact of death is proved by direct and positive evidence. In fact, counsel for plaintiffs in error, in the conclusion of their brief and argument, state that there are two things in the case which are proved beyond a reasonable doubt, one that Abel Price died and another that he was shot. There is no question, therefore, as to the death of the deceased. The controversy is as to the agency of the death.

In the following cases this court has held the evidence was sufficient to establish the *corpus delicti* and to support the conviction: *People* v. *Hotz*, 261 Ill. 239, (in which we held where the fact of the death is proved by direct evidence, the criminal agency of the defendants may be established by circumstantial evidence;) *People* v. *Schanda*, 352 Ill. 36; *People* v. *Callahan*, 324 Ill. 101; *Campbell* v. *People*, 159 Ill. 9.

In *People* v. *Hiddleson*, 389 Ill. 293, we said: "The jury, acting within the province committed to it, has passed upon the credibility of the witnesses and has determined the weight of the evidence. Unless this court can say, upon review of the whole record, that there is a reasonable doubt of guilt, the verdict of the jury will not be disturbed."

It is next contended by plaintiffs in error that the court erred in refusing to allow defendants' character witnesses

to testify that they knew the reputation of the defendants for being peaceable law-abiding citizens in the community. Twelve witnesses were called to testify to the defendants' good character, and in each instance the witness testified in subtance that he or she knew one or both of the defendants; resided within a few blocks of him or them; had known him or them for a period of years and had seen the defendants regularly during that time.

The following question was asked several of said witnesses: "Do you know the general reputation of the defendant John Laska [or John Fedora] for being a peaceable law-abiding citizen in the community in which he has resided during the period of years you have mentioned, previous to the return of the indictment in this case?" In each instance, an objection by the People was made for the reason that no sufficient foundation had been laid, and the court in each instance sustained the objection and defendants saved an exception.

As to other witnesses, counsel for defendants framed his question differently and put to each of them the following typical question: "Do you know the general reputation of the defendant John Laska. [or John Fedora] among his friends, associates, acquaintances and people with whom he commingled and came in contact, previous to the death of Mr. Price, for being a peaceable, law-abiding citizen. Answer yes or no," to which question the People objected for the reason there was no sufficient foundation, and objection was sustained by the court, and exception saved by the defendants.

The record shows that counsel for plaintiffs in error, after the court had sustained the objection to the question put to the witness Kresin, asked the court, "I would like to have indicated just what foundation should be laid, that has not been laid, so that I can make proof. I don't understand the objection or the ruling of the court," to which the court stated, "I think counsel may state or I will state the

ground on which I sustained the objection. As I understand it, the witness has not known these people. He must make certain qualifications. Objections sustained." From a careful reading of the abstract and the record itself, it does not appear that counsel for plaintiffs in error asked any of the proposed character witnesses as to whether he or she knew or claimed any acquaintanceship with the associates or neighbors of the defendants, or either of them, or with the people generally with whom the defendants came in contact. In fact, the record shows that generally counsel for defendants asked whether the witness knew the defendants' reputations for being peaceable law-abiding citizens in the community. We think it is clear under the holdings of this court that the trial judge should have permitted the witnesses to answer the questions propounded and that it was error to sustain the objections. (*Gifford* v. *People,* 148 Ill. 173; *People* v. *Okopske,* 321 Ill. 32; *People* v. *Huffman,* 325 Ill. 334.) In the latter case a witness testified she had known the defendant five or six years, seeing him frequently during that time; that she knew his general reputation for chastity and good morals in the community in which he lived and that his reputation was good. On cross-examination the witness stated she had not discussed his reputation for chastity and good morals at any time or place. On motion this testimony was then stricken but on review in this court we held it to be competent and that plaintiff in error was entitled to have the same considered in connection with the other evidence in the case.

It is evident from the colloquy between the trial judge and defendants' counsel that the objections were sustained because it was not shown that any witness had any acquaintance with the neighbors and associates of the defendants. Defendant in error contends that the holding of this court in *People* v. *Reeves,* 360 Ill. 55, is authority for such ruling. It was there stated: "The general reputation of the

defendant in a criminal case must be confined to his reputation in the neighborhood in which he resides or among his associates. \* \* \* It would be impossible for a witness to know the defendant's reputation unless the witness knew or came in contact with at least some of the defendant's neighbors or associates or persons with whom he might come in contact in the business world. \* \* \* Reputation witnesses must be shown to have adequate knowledge of the subject, but a mere claim of that knowledge is *prima facie* sufficient."

We are of the view that the language in that case was not sufficient warrant for sustaining objections to the questions asked the character witnesses outlined above. In no event, however, do we regard such an error as one that would authorize the reversal of a judgment clearly right under the evidence.

Plaintiffs in error further contend that the jury was erroneously instructed regarding the law of the defense of alibi, and counsel point out the following People's instruction: "The court instructs the jury that one of the defenses relied upon by the defendants in this case is that of alibi. You are further instructed that before this defense would be sufficient to authorize an acquittal of the defendants, it must appear that at the time of the commission of the crime charged in the indictment the defendants were at another place so far away, under the circumstances, that they could not, with ordinary exertion have reached the place where the crime was committed at the time shown by the evidence that the same was committed." Counsel contends that this instruction, first, places a greater burden of proof upon defendants than the law demands, and, second, it is so framed that it constitutes an unwarranted comment upon the evidence by the trial court. Almost this identical instruction was given and approved in *People* v. *Todd*, 301 Ill. 85, where it was contended that it was reversible error.

While numerous alibi witnesses testified for defendants, they failed to convince the jury that they had seen the defendants at such hours of the night in question as would have made it impossible for them to have committed the crime twelve miles distant in the city of Decatur, and we will not substitute our judgment for that of the jury on that point.

Furthermore, we are of the opinion that, taken together with all the other instructions given, no error was committed by the trial court in the giving of the alibi instruction complained of.

It is also contended by plaintiffs in error that the court erred in giving People's instruction No. 17 to the jury. This instruction was the standard and long-recognized instruction based upon the statute of this State that the jury are the judges of the law as well as of the facts in the case, but told the jury that, "if they can say, upon their oaths, that they know the law better than the court does, they have a right to do so; but before assuming so solemn a responsibility, they should be assured that they are not acting from caprice or prejudice; that they are not controlled by their wills or their wishes, but from deep and confident conviction that the court is wrong and that they are right. Before saying this upon their oaths, it is their duty to reflect whether, from their study and experience, they are better qualified to judge of the law than the court; if, under all the circumstances, they are prepared to say that the court is wrong in its exposition of the law, the statute has given them that right." As far as we can observe from a careful study of this question, we have been unable to find a decision in this State which holds that the giving of this instruction was error. However, plaintiffs in error cite the case of *People* v. *Bruner,* 343 Ill. 146, in support of their contention, and say that this statute was held unconstitutional as denying the right of trial by jury as heretofore enjoyed, and that the giving of

this instruction alone demands a reversal. This court held that the instruction in that case was properly refused by the trial court and this court affirmed the trial court's decision. Our decision, however, was not handed down until February 18, 1931, and the verdict in the trial below in the instant case was returned on February 13, 1931, and at that time the instruction was considered a good instruction. The record shows that plaintiffs in error made no objection to the giving of this instruction in their motion for new trial. Although they specifically pointed out several other instructions by number, they made no mention of People's instruction No. 17 now complained of. A general exception, however, was preserved in the record to the giving of all the People's instructions.

In the case of *People* v. *Popovich,* 295 Ill. 491, which was a murder case, error was urged in the giving of an instruction on behalf of the People, and we said: "The instruction is objectionable upon the ground that it presents an abstract proposition of law, but the giving of such instruction will not work a reversal unless it can be shown that some harm has been done by it." Citing *Moore* v. *People,* 190 Ill. 331; *Howard* v. *People,* 185 Ill. 552.

In *People* v. *Rongetti,* 344 Ill. 278, which was a murder case, we held that an instruction, though improperly given, will not be ground for reversal unless it is of such a nature as to have resulted in injury to the defendant's case.

In *People* v. *Shader,* 326 Ill. 145, several plaintiffs in error were convicted of murder and sentenced to death and they assigned the giving of certain instructions on behalf of the People by the trial court as error, and, at pages 164 and 165 of that case, we said: "In order to determine whether an instruction is erroneous, it must be considered in connection with all the other instructions given in the case. There may be an error in one or more of the instructions, yet, if it can be seen, when all the instructions

are considered in a series, that no injury has resulted to the party complaining, the error will be regarded as harmless." To the same effect is *Dacey* v. *People*, 116 Ill. 555, where it was held a judgment of conviction in a capital case will not be reversed for error which the court can see worked no injury to the defendant.

Furthermore, the instruction itself so limited the jury's right to judge the law as to make it harmless. It appears from the record herein that the court on behalf of the People gave seventeen instructions, and on behalf of the plaintiffs in error gave twenty-one instructions. Examination and consideration of these instructions show that the jury was fully instructed as to the law, and in view of the evidence as contained in the record and the number of unobjectionable instructions correctly stating the law, the giving of the instruction complained of herein was harmless error and could not have affected the jury in its deliberation of this case.

Plaintiffs in error finally contend that the opinion of Dr. Goodyear as to the cause of peritonitis and Price's death was improperly received, since it decided one of the two ultimate issues in the case, and that it invaded the province of the jury. Dr. Goodyear testified to a long and detailed description of the conditions which he found, part of which has been related in the statement of facts herein. The doctor continued to treat the patient until he died. About seventy-two hours after the operation, the patient developed a condition which the doctor diagnosed as peritonitis. The doctor further testified that at the point where the injury occurred the peritoneum was injured. He was present at the post-mortem examination performed by Dr. Bohrod and testified to the conditions as they found them. He was then asked, "From your treatment of this man, the operation and observation of the condition that you found when the body was opened after his death, you may tell the jury, what in your judg-

ment caused his death?" and, over objection, the doctor answered, "Death was caused by peritonitis." He was then asked the question, "And in your judgment what caused the peritonitis?" Over objection of defendants, Dr. Goodyear answered, "By a gunshot wound in the abdomen."

In the cross-examination of Dr. Bohrod he testified that peritonitis could have resulted from the bullet wound in the kidney, and he further said: "In my judgment, peritonitis might have resulted from the punctures of that peritoneum. The entire peritoneum was affected. * * * It was rough and covered with flakes of what looked like thick pus and the loops of the bowels were covered by the same method. * * * The entire intestine was in the condition I have stated. Penetration of the peritoneum by anything which leaves foreign substance is apt to cause peritonitis."

The testimony of the two doctors, particularly Dr. Goodyear, describes the bullet hole in the abdomen just over the kidney, and the condition which he found when the patient was first taken to the hospital. There was sufficient evidence before the jury, including the bullet removed by Dr. Bohrod, from which the jury could have concluded that peritonitis was the result of the bullet wound, regardless of the opinion of Dr. Goodyear that the cause of death was peritonitis, and that the peritonitis was caused by the bullet wound. Furthermore, Dr. Bohrod testified that the peritonitis might have been caused by the bullet wound, so that the answer of Dr. Goodyear, even if it were held to be error, was not prejudicial to the plaintiffs in error, and certainly should not be deemed reversible error.

We have read the cases cited by plaintiffs in error in their brief and argument on this point, but the facts upon which those decisions were based are distinguishable from the facts in the case at bar. We concede, however, there

has been difficulty in applying the proper rule for admission of medical testimony in cases of this character.

The case of *Fellows-Kimbrough* v. *Chicago City Railway Co.* 272 Ill. 71, was a personal injury case and there was a conflict in the evidence as to whether or not the plaintiff was injured in the manner charged, and it was held error for plaintiff's experts to give their opinion that the cause of the neurasthenia and the tumor or growth in the plaintiff's breast was due to the accident.

The cases of *People* v. *Rongetti,* 338 Ill. 56; *People* v. *Huff,* 339 Ill. 328; *People* v. *Braune,* 363 Ill. 551, and *People* v. *Gleitsmann,* 361 Ill. 165, were all prosecutions for either murder or manslaughter growing out of a criminal abortion and involve testimony by an expert who performed the post-mortem examination, and it was held prejudicial error for the doctor to testify that as a result of his post-mortem examination it was his opinion that death resulted from an abortion, and that the abortion was not necessary to save the patient's life. In each of those cases there was a conflict in the evidence as to whether an abortion had been committed by the defendant by the use of medical instruments which caused the peritonitis and, therefore, the patient's death, or whether the abortion was the result of some other cause. In each of those cases the defendant had testified and denied performing the operation and in none of them was it admitted that an abortion had been performed. With one exception, which is the case of *People* v. *Huff,* 339 Ill. 328, the doctors who testified had not treated the patient before her death, but simply performed the post-mortem examination. It is clear, therefore, that permitting the doctors in each of those cases to testify that the death resulted from an attempted abortion performed with some instrument, and that the abortion was not necessary to save the mother's life, was permitting the doctors to usurp the province of the jury by stating their conclusion on the ultimate issues to be found by the

jury, that is, whether it was a criminal abortion or whether the abortion was necessary to save the mother's life. In each of the foregoing cases the doctors were permitted to testify to a controverted ultimate issue, which invaded the province of the jury and was, therefore, improper.

The *Fellows-Kimbrough case, People* v. *Rongettti,* 338 Ill. 56, and subsequent cases cited by plaintiffs in error, state the rule to be that where there is no dispute as to the manner and cause of the injury and no dispute that there was an injury sustained by reason of the acts of which complaint is made, a physician may then directly testify that a later malady was or was not caused by the accident or original injury, upon the same principle that he may testify that death resulted from a certain wound. In *City of Chicago* v. *Didier,* 227 Ill. 571, we held that if there is no dispute that plaintiff was injured or as to the manner in which the injury was received, but the question is whether certain existing physical conditions are the result of the injury, the determination of which question requires special knowledge, physicians possessing such knowledge may express their opinions as to whether the physical conditions were the result of the injury.

In *People* v. *Zwienczak,* 338 Ill. 237, which was a prosecution for murder growing out of an abortion, it was stated: "That an abortion has occurred may be, and perhaps is, necessarily, the conclusion by medical witnesses from other more detailed facts, but the existence of an abortion is itself a physical fact and one upon which opinion evidence may be asked of medical men." Citing *People* v. *Carrico,* 310 Ill. 543; *People* v. *Patrick,* 277 Ill. 210; *People* v. *Hagenow,* 236 Ill. 514.

In *People* v. *Carrico,* two doctors, who testified in the prosecution for murder by abortion and who examined the girl before she died, testified that she had been pregnant and that her death resulted from an infection caused by an abortion, and it was held that they could properly so

testify. It was urged that the witnesses were permitted to give opinions on an ultimate fact determinable only by the jury. In that case the court pointed out that the ultimate issue was not whether there was an abortion but whether there was a criminal abortion, that is, an abortion not necessary to save life.

Other cases which approve of this distinction and approve of the admission of similar medical testimony are *People* v. *Hagenow,* 236 Ill. 514; *People* v. *Heissler,* 338 Ill. 596; *People* v. *Kreutzer,* 354 Ill. 430; *People* v. *Wallage,* 353 Ill. 95; *People* v. *Minzer,* 358 Ill. 345; *People* v. *Mann,* 370 Ill. 123.

Counsel for plaintiffs in error in conclusion state, "The record discloses a case where the only things which are proven beyond a reasonable doubt are that Abel Price died; that he was shot; that he had an appendectomy performed on him two hours after he was shot; * * * The rest is circumstantial evidence." Plaintiffs in error admit that the deceased was shot, and therefore, under the rulings and reasoning of this court in the cases last above cited and under this state of the record, even though the defendants deny that they shot the deceased, the attending physician was properly permitted to testify that the peritonitis was caused by the original injury, that is, the shot or the bullet wound. The trial court did not err, therefore, in permitting Dr. Goodyear to testify, and the doctor's opinion did not invade the province of the jury by giving his conclusions on the ultimate facts or issues to be determined by the jury.

After a close and careful examination of the entire record in this case, we believe that the competent testimony shows the defendants to be guilty beyond all reasonable doubt. We think the trial court committed error in refusing to let the witnesses for defendants testify as to their character, but in a case where the evidence so clearly establishes the guilt of the accused that the jury

could not reasonably have arrived at any other verdict than one of guilty, we feel that the error complained of could not reasonably have affected the result of the trial sufficiently to be called prejudicial error. Where the result reached by a judgment is clearly right, it will never be reversed for errors which do not affect the substantial merits of the case. *Wilson* v. *People,* 94 Ill. 299; *People* v. *Haensel,* 293 Ill. 33; *People* v. *Cleminson,* 250 Ill. 135.

Believing the jury would not have been justified on the entire record in returning any other verdict than the one on which the defendants were sentenced, and the record containing no substantial error, the judgment of the circuit court of Macon county is affirmed.

*Judgment affirmed.*