STATE OF MAINE
*vs.*
FREDITH J. BURBANK

Sagadahoc.   Opinion, July 26, 1960.

*Frank E. Hancock, Attorney General,*
*George M. Carlton,* for State.

*Harold J. Rubin,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ. DUBORD, J., did not sit.

TAPLEY, J. On exceptions. The respondent was indicted for the crime of murder. The case was tried before a drawn jury at the October Term, 1958 of the Superior Court, within and for the County of Sagadahoc. The State, by indictment, accused the respondent of murdering her infant female child. The jury returned a verdict of manslaughter. The respondent comes to this court on the basis of three exceptions. The first exception was taken to the refusal of the presiding justice to strike from the record the testimony of Dr. Goodof who performed a post-mortem examination of the child, the respondent contending that Dr. Goodof's testimony should not stand because the State had failed to prove that the body upon which the post-mortem examination was made was the body of the child alleged to have been murdered by the respondent. The second exception involves the refusal of the presiding justice to rule upon the respondent's motion for a directed verdict of not guilty at the close of all the testimony and the subsequent denial of the respondent's motion for a directed verdict. Exception number III brings forward the question

as to whether or not the evidence produced by the State shows any participation on the part of the respondent sufficient to establish her guilty of the crime of manslaughter.

The respondent saw fit not to testify or to present any evidence. The State's evidence developed the following circumstances: At approximately three o'clock in the morning of July 14, 1958 a man identifying himself as George Burbank, father of the respondent, appeared at the Bath Police Station and after some conversation he, in company with two police officers, went to the Marston Cabins at Woolwich, Maine where Mr. Burbank and his daughter, the respondent, lived. The respondent was found lying on the bed in the bedroom apparently suffering pain. One of the police officers in an attempt to alleviate her suffering applied first aid. On a bed in the kitchen of the cabin was found a living baby almost entirely covered with a bed covering. In due time the respondent was removed from the bed, placed on a stretcher and taken by ambulance to the Bath Memorial Hospital. Mr. Burbank picked up the baby and in company with a police officer drove to the hospital where he handed the baby to Mrs. Eva F. Pinkham, a registered nurse. There is other evidence in the State's case which must be treated in detail in considering those questions which have arisen as a result of the exceptions.

## EXCEPTION I

Counsel for the respondent objects to the testimony of Dr. Irving Goodof who made the post-mortem examination of the child on the basis that the State failed to prove the body was that of the baby the respondent was alleged to have murdered. The evidence discloses that the child was found on a bed in the kitchen of the Marston Cabins at Woolwich and from there taken to the Bath Memorial Hospital arriving there about three o'clock in the morning on July 14, 1958. The baby was taken directly to the iso-

lation nursery by Mrs. Pinkham, a registered nurse. The baby at this time was alive. Mrs. Pinkham in relating her physical observations of the condition of the child said "the left side of its head was soft and spongy to the touch." She remained with the child until Dr. Marion W. Westermeyer arrived, whereupon Mrs. Pinkham left the nursery and went about her duties. The time was approximately four o'clock in the morning. Dr. Westermeyer made an examination of the child, found the head bruised, pulpy to the touch, the forehead bruised and the bone that makes the prominence just over the left eye was cracked and there was a depression suggesting a fracture. The doctor was asked the question:

"Q. - - - - - Previously in your testimony Doctor, you have indicated an area of the head which indicated a mushiness, I believe, to you, or pulpiness. Will you describe with more particularity the exact area and perhaps the size of the area that was involved?"

and he answered:

"A. It was the most of the left half of the top of the head was pulpy, as you will find in what we call a hematoma or a collection of blood underneath the scalp — in the scalp."

The doctor pronounced the baby dead fifteen minutes after examination. Mrs. Pinkham said that the last time she saw the child's body in the isolation nursery was at six or six-fifteen in the morning. The deceased child was the only occupant of the nursery.

Mr. Robert Herbert Farnham, a mortician's assistant, went to the hospital at approximately twelve-thirty o'clock on July 14th, going directly to the isolation ward of the nursery where he was directed to the x-ray room where he obtained the body of the child and took it to the undertakers. At two o'clock in the afternoon of the same day Dr. Irving

I. Goodof, pathologist, appeared at the Mayo Funeral Home and forthwith performed a post-mortem on the child. He first made a general observation of the child as a result of which he testified:

> "A. Well, this was a dead female infant, new born, approximately twenty inches in length. The skin was generally mottled. The umbilical cord was still attached and moist. It was well tied with green string. The head showed some degree of swelling of the left side of the head, including a portion of the forehead. The left pupil was larger than the right. These, I believe, were all of the significant external findings."

In the course of his post-mortem examination he made an incision in the scalp and on reflecting the scalp he, "encountered a large amount of blood located primarily over the left side of the head, but with some extension to the right side. This blood extended forward far enough so that it produced some swelling in the region of the forehead, as I mentioned before. On clearing this material away, the skull itself could then be examined and was found to show multiple fractures, most of them concentrated in the region of the left side of the head just above the ear and possibly just behind it, but also extending across to the right side." It is to be noted that the record shows that Dr. Goodof in his opinion determined that the child was less than a day old. On July 16th George Burbank, father of the respondent, in the presence of the County Attorney, the Sheriff and investigators went to the cabin and there occurred a reenactment of Burbank's actions in the early morning hours of July 14th. He demonstrated how he took the baby from the bedroom into another room and proceeded to show how he hit the baby's head three or four times on the bedpost which obviously caused injury and damage to the head of the child. This testimony becomes significant when considering the objection of defense counsel that the

State has failed to prove that the child upon whom the post-mortem examination was made was the same child alleged to have been murdered by the respondent or that if it was the same child something could have happened to her while in the hospital that caused the injuries. A reading of the testimony demonstrates by medical proof that the State has not failed in laying a foundation for the testimony of Dr. Goodof and particularly when one compares the medical findings of head injuries by Dr. Westermeyer and what was found by Dr. Goodof in his post-mortem examination of the head.

In *People* v. *Minzer*, 193 N. E. 370 (Ill.), a similar question arose as to whether or not in a prosecution for murder the body of the deceased had been sufficiently identified as to render admissible testimony of the physician who had performed the autopsy. The testimony showed that the body of the deceased was taken to the county hospital and in turn delivered to the keeper of the morgue. The keeper of the morgue tagged the body for identification and notified the medical examiner that he was to perform an autopsy. The undertaker removed the body from the morgue after the autopsy had been performed and later a sister of the deceased identified the body at the undertaking establishment. In addition to this testimony of identification, Dr. Kearns, the Medical Examiner, described an old bruise on the deceased's right leg which corresponded with that described by a Dr. Petit who had treated the deceased after a fall a few days before her death. The court held under these circumstances that there was sufficient description of the body to lay a foundation for the testimony of the doctor.

This exception is overruled.

## EXCEPTION II

The second exception consists of two parts, the first claiming error on the part of the presiding justice in not ruling

upon the respondent's motion until after a subsequent motion on the part of the State to reopen the case in order to submit further evidence was granted. The second part concerns the denial of respondent's motion for a directed verdict. This latter part of the second exception will be determined at the time we consider Exception III.

Respondent contends that the presiding justice was without right and in error in allowing the State to reopen the case and introduce further evidence after the respondent had moved for a directed verdict at the conclusion of all the evidence and before the court ruled on respondent's motion. This brings up the important question as to what authority a trial judge has in controlling trial procedure in a criminal case. Counsel for the respondent admits that the conduct of the trial is in the discretion of the presiding justice and in the absence of any abuse of discretion or where there is no infringement upon the rights of a respondent, the trial judge has wide latitude in determining trial procedure. He contends that under the particular circumstances of this case, when the court permitted the State to reopen and introduce evidence before ruling on the motion, he then prejudiced and did violence to the rights of the accused. One of the reasons urged by respondent's counsel for a directed verdict was that Dr. Goodof's testimony failed to disclose cause of death and the fact being material, she was entitled to a directed verdict on that phase of the case. Over the objections of counsel, Dr. Goodof further testified in manner following:

"Q. And with reference to your testimony of yesterday in this cause, I believe you testified to the performance of an autopsy upon a female infant child at the Mayo Funeral Home?

A. Yes, sir.

Q. And I believe your testimony recited the manner in which this was performed and the sig-

nificant findings in so far as your opinion was concerned; is that correct?

A. Yes, sir.

Q. And based on the performance of that autopsy and the findings that in your opinion were made, I ask you at this time, Doctor, whether or not you have an opinion as to the cause of death of the infant child upon which you performed the autopsy?

A. Yes, sir.

Q. Will you tell us, please, what in your opinion was the reason or the cause of death?

A. The cause of death was lacerations of the brain due to fractures of the skull due to blunt force injury to the head.

Q. And I assume your reference to fractures, Doctor — Strike that. In your reference to fractures of the head in the last statement, are these fractures the same fractures that you have referred to and testified to yesterday?

A. Yes, sir.

Q. And your testimony here today relating to your opinion also results, or does it result from your entire examination which was testified to yesterday in so far as the examination of the body and the organs and the significance or absence of significance of any findings there?

A. Yes, sir."

It is to be noted that respondent not only objected to the admission of the testimony on the ground that the State had rested its case but also that the body of the baby was not properly identified, as complained of under Exception I. Due to the fact that we have determined that Exception I is not sustained, this ground of objection is of no avail.

In *State* v. *Martin*, 89 Me. 117, the County Attorney, after the arguments for the respondent and the State had been

concluded, was allowed by the presiding justice to call a witness to testify as to the place where the intoxicating liquor was sold. This allowance was objected to by respondent's attorney and exceptions were taken. The court said on page 118:

> "This is a matter entirely within the discretion of the presiding justice. Whenever in his opinion the occasion requires it, he may vary the ordinary order of procedure and at any stage of the trial permit evidence to be offered which had been omitted through inadvertence, or which had not before come to the knowledge of counsel. Nor is the exercise of this discretion subject to revision on exceptions."

See *Benner* v. *Benner,* 120 Me. 468; *State* v. *Cassady,* 190 P. (2nd) 501 (Ariz.). In the *Cassady* case the respondent was tried for conspiracy. After the close of the State's case the respondent moved for a directed verdict on three of the counts in the indictment. The court indicated an inclination to grant the motion, whereupon the State moved for permission to reopen the case. The court granted permission over the objection of the respondent. Further testimony was introduced. The court said on page 506:

> "We believe that the court in the exercise of a sound legal discretion was authorized to permit the state to reopen the case and submit further proof."

> "We note that at the close of the people's case defendant made a motion for a verdict of not guilty, whereupon the trial court reopened the case and permitted a witness for the people to testify that the pills were found lying loose in the purse. It is the rule in criminal cases that the trial court in the exercise of sound discretion may reopen a case for the purpose of admitting testimony in behalf of either the prosecution or the defense." *People* v. *Baker,* 51 N. W. (2nd) 240-242 (Mich.).

We are fully aware of and recognize the rights of a respondent in a criminal prosecution. A justice presiding in a criminal case not only has the responsibility of protecting the rights of one accused of crime but also an equal responsibility to the people of the State to the end that justice is not thwarted by mistake or inadvertence. The presiding justice under the circumstances of this case was well within his rights and his discretionary powers of trial procedure in permitting the State to reopen and present further evidence after the respondent's motion for a directed verdict of not guilty had been made. This exception is overruled.

## EXCEPTION III

Respondent contends that there was insufficient evidence upon which to base a jury finding of manslaughter. The respondent in her conversation with an officer said that she went to bed around ten or ten-thirty and soon after experienced pain; that her father came into the room and at that moment the baby was born; that she sat up in bed, looked at the baby, saying that the baby was blue and that it didn't look normal, and she said something would have to be done with it. The baby started to cry, and as the baby cried she said to her father, "do something with it — hit it in the head." The evidence further discloses that the father took the child into the next room, closed the door and hit the child's head against the bedpost two or three times.

There is no evidence that the respondent left her bed after the birth of the child nor does the State contend there is. The State admits that according to the evidence the door was closed between the two rooms and "that the respondent was not physically in the immediate presence of her father in the kitchen" at the time he committed violence upon the child. The State contends that even though she had not left the bed nor was she physically present in the room

where the act occurred she was, nevertheless, guilty of manslaughter on the basis (1) that she was constructively present; and (2) that she commanded, incited and encouraged her father to commit the act.

Under these circumstances, is the respondent guilty of the crime of manslaughter? If she is guilty of manslaughter, it must be because the evidence is such that she is placed in the category of a principal to the commission of a felony as there is no proof of her physical engagement in the act which caused the injuries resulting in death.

> "A principal of the second degree is one who is present lending his countenance, encouragement or other mental aid while another does the act." *Bishop's Criminal Law*, Vol. 1, Sec. 648 (3).

In order for one to be a principal, it is necessary for him to be present, either actually or constructively.

Constructive presence is sufficient to satisfy the element of "presence" in a charge of aiding and abetting in constituting one a principal. *English* v. *Matowitz*, 72 N. E. (2nd) 898 (Ohio).

> "It is settled law that all who are present (either actually or constructively) at the place of a crime and are either aiding, abetting, assisting, or advising in its commission, or are present for such purpose, to the knowledge of the actual perpetrator, are principals and are equally guilty." *State* v. *Holland*, 67 S. E. (2nd) 272-274 (N. C.).

> "To constitute one an aider and abettor in the commission of a crime, he must be actually or constructively present at the time of its commission and render assistance or encouragement to the perpetrator." *Howard* v. *Commonwealth*, 200 S. W. (2nd) 148-150 (Ky.).

In *State* v. *Rodosta*, 138 So. 124 (La.), one Peter Rodosta and his wife were charged with the crime of murdering

their infant child seven days old. Peter Rodosta was tried separately and convicted of the crime of murder. He was not the perpetrator of the crime but was charged as principal. The evidence in the case supported his contention that he was not present actually or constructively when the child was killed. The court on page 126 said:

"According to all law writers, and as settled by our own jurisprudence and that of other states, one who is not the actual perpetrator of a felonious act, but who aids, abets, counsels, or procures its commission, is not a principal, unless actually or constructively present at the commission of the crime."

This court said in *State* v. *Saba, et al.*, 139 Me. 153, at page 156:

"The proper rule of law is that to constitute one as a principal in the commission of a felony, he must be proved to be present either actually or constructively at the time and place it was committed. The issue of actual presence is necessarily simple."

See also *State* v. *Rainey*, 149 Me. 92.

"The advice or encouragement that will make one a principal in a felony may be given by words, acts, or signs. Therefore, one who inflames the minds of others and induces them by violent means to do an illegal act is guilty of such act, although he takes no other part therein. If he contemplates the result, he is answerable, although it is produced in a manner different from that contemplated by him. If he awakes into action an indiscriminate power, he is responsible." 14 Am. Jur. Criminal Law, Sec. 90.

"Any participation in a general felonious plan, provided such participation be concerted, and there be constructive presence, is enough to make a man principal in second degree, as to any crime committed in execution of the plan."

Regarding participation and presence, reference is made to 40 C. J. S. — Homicide — page 839, Sec. 9 (c).

Counsel for the respondent strenuously argues that the elements constituting manslaughter are such that she cannot be a principal to the crime as aiding, abetting, counseling, inciting and directing are all inconsistent with the commission of a crime resulting from heat of passion or sudden provocation. He says the very nature of circumstances here present precludes this respondent from being a principal.

In *State v. Coleman*, 5 Porter 32 (Ala.) (1837), the respondent Coleman was found guilty of manslaughter on an indictment charging him and another with murder. The indictment charged Kennedy with the shooting and Coleman as being present, aiding and abetting. On a motion in arrest of judgment counsel for Coleman, among other grounds, contended (1) "The indictment showed that Coleman, if he did anything, only aided and abetted Kennedy, and under that charge, he could not be found guilty of manslaughter; because the very nature of the offence, with which Coleman was charged, implied premeditation, and would make it murder, if it were any offence at all." (2) "No one could commit man-slaughter, except the one who actually kills; because man-slaughter is an unlawful killing without malice." The court on page 41 said:

> "The man who, without any predetermined purpose, but under the influence of a momentary excitement, aids and abets his friend in an affray, in which the friend kills his adversary, is not guilty of murder, because malice, an essential constituent of the crime, is wanting; yet, he is not wholly dispunishable, for aiding and abetting an unlawful homicide.
>
> "Upon authority, it seems unquestionable that there may be aiders and abettors in manslaughter; and Russell, (1. vol. 456.) lays it down, that 'in

order to make an abettor to a manslaughter a principal in the felony, he must be present, aiding and abetting the fact committed.' This learned author is sustained by Hale."

"One may be held guilty as a principal in the second degree, or as an aider and abettor, to the crime of manslaughter, including, according to the weight of authority, involuntary manslaughter, although as to the latter proposition there is some authority to the contrary." 40 C. J. S. — Homicide — page 839, Sec. 9 (b).

"While the characteristic element of the crime of manslaughter is that although a homicide, it is committed in sudden heat and passion and without malice aforethought and will not therefore admit of accessories before the fact, yet this does not necessarily limit the offense to the persons who actually did the deed when several were present and engaged in a common quarrel. The provocation given may extend to others as well as to the principal actor. Although the crime is said to be sudden and unpremeditated, it need not be on the instant the provocation is received. In its regard for the weakness of human nature, the law allows a certain time — reasonable time — for the transport of passion to continue before 'cooling,' and during that time it is possible for others present, affected by the same provocation and passion, to stimulate and incite the principal actor to the perpetration of the deed, thereby becoming aiders and abettors." 14 Am. Jur.— Criminal Law — Sec. 84.

The respondent in the case at bar, an unmarried female, gave birth to a child. During the period of pregnancy she and her father had discussed what action should be taken as to the child after its birth. It was determined that if the child was born a normal child it would be left at a foundling home but if not normal something would have to be done with it. The mother had a feeling, as she said, "that the baby would not be normal due to the way it was

conceived." Thus the child came into the world unwanted and, according to the mother, its life depended upon a decision as to whether the child was normal or not. The child was born under abnormal circumstances in so far as the relationship of the parents was concerned. At the time of birth the mental processes of the mother must have been, according to the evidence, in a confused state. The child was born without benefit to the mother of medical attention. She was in the throes of pain and bleeding profusely. There was no opportunity for her to exercise a normal and reasonable power of decision. On the evidence the jury could properly determine that the direction to kill and the verbal aiding and abetting on her part were not the results of a cool and calculating mind but came from one influenced by passion provoked by the birth of the child under circumstances fraught with desperation. It is true that she contributed no physical effort to bring about the injuries to the child which eventually resulted in death. Nevertheless she participated to an extent which the law recognizes as sufficient to bring her within the category of a principal to the crime of manslaughter.

Exception III is overruled.

*Exceptions overruled.*

*Judgment for the State.*