**People of the State of Illinois, Plaintiff-Appellee, v. James Calvin, Defendant-Appellant.**

Gen. No. 52,222.

First District, Second Division.

November 18, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Paul Bradley, Theodore A. Gottfried, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and John R. McClory, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Defendant was found guilty by a jury of the crime of murder and was sentenced to a term of 14 years to 20 years in the penitentiary. He appeals.

About 3:15 a. m. on January 20, 1966, Walter Barber, the deceased, was shot by the defendant at a diner located at 1150 South Kedzie Avenue in Chicago. The deceased had been sitting at the service counter in the diner at the time the defendant entered shortly before 3:15 a. m. The defendant seated himself at the counter, placed his head on the counter and allegedly fell asleep. A short while later one of the other patrons in the diner, a man named Lee, slapped the defendant on the back and said, "Hi, James!" Defendant, who was either spun around on the counter stool by the slap or who spun himself around on the stool, thereupon drew a revolver.

The manager of the diner, who testified for the People, stated that defendant, after he had been slapped on the back, had words with Lee and another of the patrons in the diner, and that he drew the revolver and fired a shot into the floor. The deceased, who was seated near-

by, moved his arm and the defendant told him to keep his hands on the counter. Defendant then walked over to the deceased, placed the gun to his head, and stated, "You look like one of those fellows that jumped me last week." The witness testified that the deceased thereupon rose from his seat at the counter and attempted to get out the door, but that defendant fired a shot past his head and told him to sit down. The witness further testified that the deceased continued to try to reach the door, that the defendant kept pushing him and telling him to "stay back, before I shoot you," and that when the deceased kept advancing, the defendant shot him in the body, paused and then shot him twice more. The defendant left the diner, returned shortly and fired two more shots, one at the deceased and the other at the record player. The deceased was then helped out of the diner by another man. The manager testified that at no time did the deceased speak to the defendant, nor did the deceased have any weapon in his hand.

Chicago Police Officers Fritz and Klomfar testified that at approximately 3:30 a. m. on the morning in question they received a radio communication of a burglary at the apartment of the defendant. When they arrived at the apartment they were told that someone had broken into the defendant's apartment and had stolen his brother-in-law's revolver. The officers testified that they located a revolver in the apartment, that it smelled as if recently fired, and that defendant explained its presence in the apartment by stating that "whoever took the gun must have used it and brought it back."

The officers testified that they contacted headquarters concerning the registration of the gun and were informed by Sergeant Doll that the defendant was wanted in connection with the shooting at the diner. They transported the defendant to the diner, and as the de-

fendant alighted from the squad car, about a dozen persons at the scene shouted, "That is him, that is James!" The officers testified that they did not get the identification of any of those persons who allegedly shouted defendant's name as he alighted from the police vehicle.

Police Sergeant Doll and Officer Kalis were permitted to testify for the People, over objection of the defendant that their names did not appear on the list of witnesses submitted to the defendant before trial. Officer Kalis testified that he received a radio communication of a man shot at the diner in question. He testified that he proceeded to the location and found the deceased, still alive, sprawled in an automobile nearby. He stated that the police sergeant arrived shortly afterwards, that a police ambulance was called for, and that when it was found that none was available, the sergeant drove the deceased to the hospital in his police vehicle. The officer testified that he searched the person of the deceased before he was taken to the hospital but did not find a weapon. He also testified that he made a visual search of the automobile in which the deceased had been lying and did not see a weapon.

Police Sergeant Doll testified that after he arrived at the scene of the shooting, he attempted to secure a police ambulance to transport the deceased, who was alive, to the hospital for treatment, and that when it was learned that none was available, he drove the deceased to the hospital in his squad car. On the way to the hospital the sergeant asked the deceased what had occurred and the deceased replied that "he didn't know the man, just walked in and shot him for no reason." The testimony of the sergeant concerning the statement by the deceased was objected to by the defendant, but the statement was received into evidence as a dying declaration. The sergeant further testified that he searched the person of the deceased and found no weapon, but that he did not search the automobile

in which the deceased was lying when the sergeant arrived on the scene.

The coroner's pathologist testified that the deceased died some time after having been admitted to the hospital, of gunshot wounds in the abdomen.

The defendant testified that about two weeks prior to the shooting he had been severely beaten by the deceased and two other men. He stated that he saw the deceased earlier the evening of the shooting in the company of the two men who were with him the day the defendant was beaten, and that he armed himself as a result. The defendant further testified that he drew his revolver in the diner after Lee had slapped him on the back and after he observed the deceased in the diner also. He stated that the deceased approached him and went into his pocket for a knife or a razor. Defendant told the deceased to "back off" and as the deceased continued to approach, the defendant fired five shots, the first into the air, the second into the record player and the third into the deceased's leg as an attempt to halt his approach. The fourth shot was fired into deceased's midsection, and after firing the fifth shot the defendant ran from the diner. Defendant testified that he then caught a taxi for home and that his nephew had notified the police that his apartment had been burglarized.

Mrs. Evelyn Goodwin, a student at the American Institute of Engineering and Technology, testified as a defense witness and stated that she was present in the diner when the shooting occurred; that she observed the defendant standing near the door to the diner and the deceased standing at a stool near the counter; that she heard the defendant say to the deceased that the deceased and his partners would not "jump him" as they had before; that she observed the deceased reach into his pocket and start to draw out a knife; and that the defendant then shot the deceased. The wit-

ness further testified that she heard two or three more shots fired and that she then fled from the diner.

Defendant first contends that the statement made by the deceased while being transported to the hospital after the shooting, as testified to by Sergeant Doll over objection of the defendant, was improperly admitted into evidence as a dying declaration inasmuch as all the elements necessary for its admission as an exception to the hearsay rule were not present. We agree.

■■■■ The law attending the admissibility as evidence of dying declarations is firmly established in this State. In People v. Odum, 27 Ill2d 237, at pages 242–243, the Supreme Court states:

> "[Dying declarations] are defined as statements of fact by the victim, concerning the cause and circumstances of a homicide. To make them admissible into evidence as dying declarations, an exception to the rule against hearsay evidence, it must appear that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand. People v. Tilley, 406 Ill 398, 403; People v. Hubbs, 401 Ill 613; People v. Savant, 301 Ill 225."

The Court then holds, at pages 243–244 of the opinion:

> "In this case the testimony shows that none of the medical personnel advised the victim that he faced imminent death. What the victim himself said cannot be construed as indicating that he had abandoned hope. While the police officers frequently stated that the victim was dying, it is the state of mind of the deceased and not that of any other

person which determines admissibility. (People v. Tilley, 406 Ill 398, 403.) As this court held in People v. Maria, 359 Ill 231 and Brom v. People, 216 Ill 148, the belief of the dying man and not the belief of those around him furnishes the guaranty of truthfulness that makes his dying declaration admissible in evidence."

The early case of Starkey v. People, 17 Ill 16, sets out at pages 19–20 the reasons for the stringent rules governing the admissibility of dying declarations:

"The accused, under the rule, has not the benefit of 'meeting the witness against him face to face,' a constitutional right in all criminal trials with this solitary exception. He is deprived of the security of an oath attended with consequences of temporal punishment for perjury. He is deprived of the great safeguard against misrepresentation and misapprehension—the power of cross-examination. The evidence is hearsay in its character; the statements are liable to be misunderstood and to be misrepeated upon the trial, and the evidence goes to the jury with surroundings tending to produce upon the mind emotions of deep sympathy for the deceased, and of involuntary resentment against the accused."

The only evidence in the record before us which relates to the alleged dying declaration made by the deceased, and to the circumstances surrounding its utterance, is the testimony of Sergeant Doll, which is as follows:

Q. [Assistant state's attorney] "And directing your attention to about 3:15 on [the morning in question,] where were you at that time, sir?"

A. [Sergeant Doll] "I responded to a call at 11 something South Kedzie Avenue, Roosevelt and Kedzie, of a man shot."

478

Q. "And what did you do, sir, in responding to that call?"

A. "I pulled up in my squad car. The other officers on the squad car (sic) were already there. Called for a wagon and unable to receive a wagon. All wagons were tied up."

Q. "What did you do next?"

A. "I took the victim of the shooting and took him to the back of the squad car and ran him to the emergency room of Mount Sinai Hospital."

Q. "Sergeant Doll, at this time was the victim, Mr. Barber, imminently in fear of death?"

A. "I believe he was, yes, sir."

Q. "And did you have a conversation with him at this time, Sergeant?"

A. "Yes, I did."

Q. "What did you say to him and what did he say to you in that conversation?"

A. "Well, I asked him what happened and he stated that he didn't know the man, just walked in and shot him for no reason."

[Defense counsel]: "Objection, Your Honor."

[Assistant state's attorney]: "Dying declaration."

THE COURT: "It may stand."

█ The statement of the deceased should not have been allowed into evidence. Clearly, the requirements for its admission as a dying declaration were not present. The sergeant testified to nothing, and there is nothing in the record apart from his testimony, which would indicate the attitude which the deceased had toward his condition at the time; there is no evidence that he possessed the "fixed belief and the moral conviction" that his death was impending and certain, as required by People v. Odum, supra. The officer stated only what he believed was the state of mind of the deceased,

without regard to anything the deceased might have said or done to evidence that state of mind. People v. Maria, 359 Ill 231, 194 NE 510.

Further, the People were permitted, during closing argument to the jury and over objection of the defendant, to comment at length concerning that statement of the deceased, categorizing it as "the most important part of the Sergeant's testimony, by far, going away, . . . as brief as it might be between him and the deceased, . . ." and stating to the jury that the reason such a statement is allowed into evidence as an exception to the hearsay rule is the "fact that a man will never lie when he stands at death's door waiting to go to his Maker." We are unable to say what effect the evidence, and the comments by the prosecutor, had on the jury in arriving at their verdict. See Starkey v. People, 17 Ill 16, 19–20.

■ The People argue that the deceased's statement to Sergeant Doll is nonetheless admissible under the rules pertaining to spontaneous declarations. The ground advanced in support of this position is that the deceased was in a physically agonizing condition after having been struck by the three bullets, which so affected his state of mind that he had no opportunity to reflect and to fabricate the declaration made to the sergeant. The record is devoid of any evidence regarding the "agony of horrendous tissue destruction and tremendous hydraulic shock" experienced by the deceased after the shooting which "would necessarily be such as to obviate any opportunity to reflect and invent between the firing of the shots and the declaration." The declaration was made by the deceased to the sergeant a considerable length of time after the shooting occurred and does not qualify as a spontaneous declaration under the circumstances here involved. See People v. Poland, 22 Ill2d 175, at 180–181, 174 NE2d 804. (It should also be noted that the statement of the deceased was original-

ly admitted into evidence as a dying declaration; it was not until the motion for a new trial that the People advanced the theory of its admissibility as a spontaneous declaration.)

Defendant next contends that it was error to permit Officer Kalis and Sergeant Doll to testify, inasmuch as their names were omitted from the list of witnesses and their testimony surprised the defendant. The trial court gave the defendant adequate time and opportunity to interview the witnesses prior to their taking the stand, after it was learned that the People intended to call them as witnesses. Nevertheless, this contention is obviated, first, by the view we take of the admission of the testimony of Sergeant Doll relating to the alleged dying declaration made by the deceased and, second, because the balance of the testimony of the two officers was harmless, in that it related solely to the transportation of the deceased to the hospital after the shooting and in no way bore on the shooting itself.

■ Defendant also argues that the trial court committed error in allowing the testimony of Officers Fritz and Klomfar with respect to the several persons at the scene of the shooting who shouted, "That is him, that is James!" when the defendant was returned to the scene. The testimony of Officer Fritz in this regard was objected to on direct examination, but the defendant, on the cross-examination of the officer, asked no less than eleven questions concerning the statements and the identity of the persons who made them. No objection was made to the testimony of Officer Klomfar when he testified to the statements made in this regard on direct examination, and defendant again went into the matter on the officer's cross-examination. This ground has been waived. See People v. Voleta, 57 Ill App2d 279, 206 NE2d 737.

The final contention raised by the defendant is that the trial court erroneously refused to instruct the jury

on a charge of voluntary manslaughter, whereas the evidence in the record supports such an instruction. (People v. Taylor, 36 Ill2d 483, 487–489, 224 NE2d 266.)

It appears that defense counsel desired an instruction relating voluntary manslaughter resulting from serious provocation, in accordance with section 9–2(a) of the Criminal Code, rather than one dealing with a defendant's unreasonable belief that the circumstances justified a homicide, in accordance with the provisions in section 9–2(b) of the Criminal Code. (Ill Rev Stats 1965, c 38, par 9–2(a) and (b).) Defendant states that his desire to have the jury instructed on a manslaughter charge was communicated to the trial judge, although it was not based upon the proper subsection of the statute, and that it was therefore "incumbent upon the trial judge to give a voluntary manslaughter instruction based upon Section 9–2(b) . . . sua sponte." Inasmuch as this matter must be reversed and remanded, we feel that this question will not arise again if there is a re-trial of this cause.

For these reasons the judgment is reversed and the cause is remanded for further proceedings not inconsistent with the views expressed.

Judgment reversed and cause remanded with directions.

LYONS, P. J. and McCORMICK, J., concur.