THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DAVID BOST, Defendant-Appellant.

Fifth District   No. 77-506

Opinion filed February 6, 1980.

John H. Reid and Patricia L. Morris, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kelly D. Long, State's Attorney, of Hillsboro (Raymond F. Buckley, Jr., and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE HARRISON delivered the opinion of the court:

Defendant, David Bost, was charged by indictment with four counts of murder and was found guilty by jury of one count of voluntary manslaughter. He was sentenced to 6 to 18 years' imprisonment. On appeal he contends: (1) that the State did not prove beyond a reasonable doubt that his belief that the killing of Robert Lancaster was justified was unreasonable; (2) that the trial court erred in refusing to submit to the jury a non-IPI instruction; (3) that he was denied a fair and impartial trial due to numerous acts of prosecutorial misconduct; and (4) that the sentence he received was excessive.

The trial of this cause lasted six days. Twenty-eight witnesses testified for the State, while nine gave testimony for the defense. Three other witnesses testified in chambers out of the presence of the jury. The transcript of these trial proceedings exceeds 1000 pages, with the entire record encompassing 14 volumes. Therefore, we recite only those matters necessary for a clear understanding of this case.

A four-count information was issued against defendant as a result of the shooting death of Robert Lancaster in Farmersville, Illinois, on December 21, 1976. On December 30, 1976, a four-count murder indictment was issued against defendant. From March 7 through March

14, 1977, a jury trial was held in Montgomery County circuit court. However, the jury was deadlocked and a mistrial was declared. Pursuant to his motion for a change of venue, defendant was retried in the circuit court of Fayette County from May 2 through May 7, 1977.

The evidence showed that the defendant was hired to work at the Virden Crown 2 Mine in Farmersville as a repairman beginning on December 6, 1976. He rented an apartment there while his family remained in Belleville. Defendant had first met the victim, Robert Lancaster, at their physical examination for their new jobs during the last week of November. Other than a few minutes of conversation, they did not see each other again until December 11, 1976.

Defendant encountered Lancaster at the Uptown Tavern in Farmersville on December 11. When defendant pulled some money from his pocket to buy a round of beer for Lancaster and some of his friends, a .38-caliber wadcutter fell from his pocket. A wadcutter, as shown at trial, is a bullet with a flat, rather than protruding, rounded projectile which is used mainly for target shooting. At that time, Lancaster apparently initiated a discussion as to what effect he thought the wadcutter would have when it was fired into a one-gallon milk jug filled with water. Lancaster hypothesized that it would make a clean hole, while defendant opined that it would blow the back of the jug out because of the flat projectile. Finally, a $20 bet was made regarding the dispute, which bet was written down by a woman in the bar, Sue Ellen Morgan, and signed by defendant.

Several discussions followed as to how and when to settle the bet. The following night, December 12, Lancaster took defendant to Lancaster's truck where he had two milk jugs. Lancaster told defendant that he had won the bet, because it had taken "his .357 to do what I said the .38 would do." Defendant told Lancaster that since the .38 wadcutter had not been fired, the bet was still not settled. Defendant testified that Lancaster then said "that I would pay him or I would find out what that other bullet would do but it wouldn't be on any jug." They agreed to settle the bet the following morning.

That night while working, defendant injured himself. Therefore, defendant did not meet Lancaster the next morning as planned. According to defendant, when the two next encountered each other at work on Wednesday, December 15, Lancaster walked toward him "like he wanted to say something." However, Lancaster's friend, Ray Stansbury, "told Robert to come on, that that wasn't the time or place," and no further discussion occurred. While the argument subsided for the moment, defendant claims that the next morning, Thursday, December 16, Lancaster threatened him with a hammer.

After work on Thursday, defendant went to Belleville to see his

family. Defendant testified that on Thursday evening he went to Sir Arthur's Tavern where his wife had worked for approximately three weeks prior to his getting the job in Farmersville. There he spoke about purchasing a gun with a man who referred him to another man from whom he purchased a .22-caliber revolver. Defendant said he purchased it because he had "never once been threatened * * * and when somebody threatens my life I consider it, well, a danger to me." He also testified that he was afraid of Lancaster at the time he bought the gun. Defendant did not know the full name of the man who sold him the gun and that person did not testify at trial.

After working the midnight shift on Tuesday morning, December 21, defendant said he drove to Zalar's Tavern, arriving at approximately 8:45 a.m. He ordered a beer and one shot of brandy. About 20 minutes later, according to defendant, Lancaster and Stansbury came into the bar. Defendant bought them both a beer. Defendant testified that Stansbury left about one-half hour later, but no witnesses ever saw Stansbury at the bar. In fact, Stansbury testified that he did not go to the tavern at all that morning, but arrived only after he learned of the shooting.

About 11 a.m. Lancaster went outside and brought in the two milk jugs, claiming to have won the bet. The argument went on for a while, but died down. The argument commenced once more and continued for approximately one-half hour. About this time Lancaster took defendant to the other end of the bar to discuss the bet with Illinois State Trooper Charles E. Traylor, an acquaintance of Lancaster's who was off duty and in the tavern. Traylor was with another off-duty State trooper, Ronald Wilton. Defendant claimed that Traylor was not introduced to him as a police officer, although "it might have been said but I didn't hear it." However, Traylor testified that he was introduced as a State trooper. Nonetheless, Traylor said he could not settle the bet for them.

Defendant further testified that in order to show Lancaster he was not trying to back down, he tried to raise the bet to $100. He took out a $100 bill and slapped it on the bar in front of Lancaster who picked it up and asked Frank Zalar, the owner of the bar, to change it, give him his $20 and return the balance to defendant. Zalar testified that he did not want to have anything to do with bets and refused to change it. At this time Lancaster threw the bill back to defendant telling him not to "let him see me again until I was ready to settle the bet."

Defendant then testified: "Well, I was wanting out of the tavern. I was pretty scared. I was wanting out of the tavern so I left." He said he got into his car but it would not start, claiming that he had also had trouble starting it earlier that morning. Two State's witnesses, however, Loren Guthals and Robert Gorman, were outside the tavern while defendant was at his car and testified that he did not get in behind the

wheel but only opened the driver's door. But neither could really tell what defendant was doing at the car. Defendant testified that he remembers leaving his cigarettes and lighter in the bar and returning to get them as well as to ask Guthals, whom he had seen inside earlier, to give him a jump start. However, he said he was afraid of Lancaster, and therefore, took the .22 pistol from the floor of his car and put it in his pocket.

Defendant's version of the story continued as follows. He went back in the tavern and went straight to the bar. He did not see Lancaster when he first arrived, but then Lancaster came up beside him and started to drink his beer. According to defendant, Lancaster "asked me if I was back for some crap or if I came back to settle the bet." Defendant replied that he had only come back for the lighter and while they continued to argue, he started walking toward the door to leave. He had taken a few steps when he turned to Lancaster and said he was not trying to back down from a "[obscenity] thing," claiming that the obscenity was not directed personally at Lancaster. While continuing toward the door, defendant heard chairs rattling or crashing and someone say "oh, no, or oh, my God, no." Upon turning around he saw Lancaster coming toward him "at a good clip." Lancaster's jacket was open and his arms were at his side, but he could not see his hands. Lancaster appeared angry and defendant said he was scared so he reached in his pocket and pulled his gun. Defendant told Lancaster to "hold it right there" and said a profanity. All this time defendant claimed to be backing up toward the door.

About the time defendant said he issued his warning, he heard someone say, "he's got a gun." At the same time he heard this, the defendant testified that Lancaster's hand started coming out from behind his coat when they were within a few feet of each other. He further testified:

> "When someone said 'he's got a gun' my first thought was 357 because that is what he had been talking about that morning several times. He had mentioned his 357 and what it would do, you know, and in a threatening manner. When I thought a 357, I thought of that milk jug. When I thought of the milk jug it was frightening."

At this time defendant fired one shot at Lancaster. Since Lancaster kept coming at him, defendant closed his eyes and fired two more shots. Defendant said that while his eyes were still closed, the gun was knocked from his hand and hit him in the nose, thereafter landing on the floor. Presumably, it was Lancaster who jarred the gun loose. Defendant bent over, picked the gun up and intended to go out the door but Lancaster was blocking it. Defendant ran to the far end of the bar looking for a back door. Finding none, he ran back the way he had come. Lancaster,

according to defendant, was away from the door but still standing when he ran out of the tavern.

This is a remarkably different story from the one rendered by the over one dozen State's witnesses who were present in the bar at the time of the shooting. Most agreed that at times, the voices of defendant and Lancaster rose above the other noise in the tavern, but none felt that this was extraordinary at the time. Yet, most agreed that defendant's voice was louder than Lancaster's. Ray Emerson, a part-time city policeman in Farmersville, said that Lancaster appeared to be calm and laughing "like it was a joke." And Rick Brockmeyer, a witness who was in the bar, said that after defendant came back into the bar from outside, Lancaster "wasn't saying a word," while defendant continued the argument.

Also, while defendant testified he did not see Lancaster when he returned to the bar from outside, the consensus was that Lancaster was on the telephone at the time defendant returned. At least one witness, Steve Rigney, who was closest to the telephone, testified that defendant, while "mouthing a little bit," walked up to Lancaster when he was on the phone, but Lancaster ignored him. When Lancaster returned to the bar, six witnesses agreed that defendant inveighed Lancaster with one or more profanities they preferred not to repeat in the courtroom. This was contrary to defendant's testimony that the profanity was not directed at Lancaster. Subsequent to this, some witnesses heard Lancaster say to defendant, "What do you want, a piece of my ass," or something to that effect.

After defendant's invective, Lancaster began to approach him. No one other than defendant heard anyone say, "oh, no, or oh, my God, no." Only one of the State's witnesses, Bob Gorman, testified that Lancaster was walking at other than a normal pace toward defendant. He said Lancaster advanced toward defendant "a little bit faster than normal walk but not much." The witnesses generally agreed at trial that Lancaster's hands were by his side when he went toward defendant, although defense counsel tried to impeach one of the witnesses with a prior inconsistent statement he had given to a defense investigator. And while Emerson said that Lancaster approached defendant with his arms "out like that," he further stated that Lancaster's arms were at his side when he was shot. While not all the witnesses could see Lancaster's hands as he advanced toward defendant, the substance of the testimony was either that Lancaster had nothing in his hands or that no one saw him reach under his jacket and draw his hand out as stated by defendant. None of the State's witnesses heard defendant warn Lancaster to "hold it right there" prior to firing the first shot, or heard someone say "he's got a gun" as testified to by defendant. Also, the witnesses for the State agreed that Lancaster had not threatened defendant prior to the shooting.

Numerous witnesses saw a chrome-plated revolver in defendant's hand immediately prior or subsequent to the shots being fired. Finally, all of the witnesses' testimony had Ray Emerson along with Frank Zalar helping Lancaster to the floor before defendant ran through the front door.

State Trooper Steven Huggins, who was called to the scene, testified that he checked the outer pockets of Lancaster's coat and shirt, and patted the outside of his pants pockets but found no gun on or near the body. Officers Traylor and Wilton, who had left prior to the shooting but who apprehended defendant approximately one-quarter to one-half mile from the scene, testified in accordance with Huggins that Lancaster showed no signs of life at the time they investigated the scene, approximately one-half hour after the shooting. In fact, the witnesses testified that Lancaster died three to four minutes after the shooting. This was corroborative of the' testimony of Dr. William K. Drake, the pathologist from the Montgomery County coroner's office, who testified that one of the three bullets pierced the right atrium of Lancaster's heart, causing him to bleed to death.

The jury returned a verdict of guilty of voluntary manslaughter. Defendant filed a post-trial motion but it was denied on June 7, 1977. On June 13, 1977, defendant was ordered committed to the Joliet Correctional Center for presentence examination. On September 6, 1977, the sentencing hearing was held. Defendant had submitted a motion for probation while the State had filed a motion for an extended term sentence.

Six men testified on behalf of defendant that he was a good candidate for probation. Defendant's wife testified that she had found her husband a job in California as a brick mason and that he should be released on probation "because he has a family and because we miss him." Defendant testified:

> "I know for a fact that a prison sentence can in no way help, help me or help the Lancaster family or help anyone involved. It can't change or correct in any manner what has happened. I'm certainly sorry that this happened, extremely sorry."

He felt that further imprisonment was not needed to protect the public because "an incident like what has happened would never happen again. I'll never place myself in a situation such as this." Continued imprisonment, said the defendant, could benefit no one and only be a "financial problem and extreme hardship for my wife."

Ethel Lancaster, the victim's wife, testified for the State. She said that she had to move from her house because her two boys were afraid of it and afraid defendant or his family would come there and kill them. She felt probation would deprecate the seriousness of the offense and felt defendant should be punished the rest of his life, even to the point of his

life being taken. Trooper Huggins also testified that defendant, as well as every individual convicted of voluntary manslaughter, should receive at least five years' imprisonment or else the seriousness of the offense would be minimized.

The evidence at the sentencing hearing showed that this was defendant's first offense. Psychological and psychiatric evaluations in the presentence report concluded that this offense was situational rather than premeditated. Defendant argued that from all the evidence adduced at the hearing it was clear he had good rehabilitative potential. However, the trial court denied both defendant's motion for probation and the State's motion for an extended term sentence, stating the following in issuing its sentence:

> "Now the Court has considered all the evidence in this case, of course, considered the Pre-sentence Report and the two supplements in connection therewith, considered the information that has been elicited here in open court both on behalf of the State and on behalf of the Defendant and either in aggravation or mitigation and allowed the defendant to speak in his own behalf and heard the arguments of counsel and has also considered the report of the examinations in the Correctional Center at Joliet and has taken all of these matters into consideration. This is a very serious offense in the mind of the Court and it's the judgment of the court that the defendant be sentenced to an indeterminate number of years with the Department of Corrections, Adult Division, State of Illinois for a minimum period of not less than six years and a maximum period of not more than eighteen years. Judgment will be entered for costs. In view of the defendant's unemployment for the past period of time I see no reason for imposing a fine. I don't see how it would be possible for him to be able to pay a fine."

From this judgment a notice of appeal was filed on September 8, 1978. For the following reasons, we affirm the judgment of the trial court.

Appellant first contends that the State did not prove beyond a reasonable doubt that his belief of justification was unreasonable. In other words, he argues that he was not proved guilty of voluntary manslaughter beyond a reasonable doubt. The basis of this position is that because the victim was four inches taller and 85 pounds heavier than he was and was advancing toward him, he was justified in using self-defense. We need not embark on an extended recitation of the law of self-defense, other than to note that justification thereunder has always been a question for the trier of fact. (*People v. Jordan* (1960), 18 Ill. 2d 489, 492, 165 N.E.2d 296; *People v. Reeves* (1977), 47 Ill. App. 3d 406, 409, 362 N.E.2d 9.) The resolution by the trier of fact will not be set aside unless the evidence is so unsatisfactory as to raise a reasonable doubt as to defendant's guilt.

*People v. Dawson* (1961), 22 Ill. 2d 260, 264, 174 N.E.2d 817; *People v. Watkins* (1970), 46 Ill. 2d 273, 263 N.E.2d 115.

•■ ■ Appellant's effort to persuade us as to the reasonableness of his beliefs is nothing more than an attempt to recite the evidence most favorable to his defense and urge us to adopt the position rejected by the jury. As set forth above, while the evidence against appellant was overwhelming, there was some conflicting testimony as to the nature and extent of the argument prior to and at the time of the shooting and the manner in which the victim approached appellant immediately prior to the shots being fired. These conflicts are minor and affect only the witnesses' credibility rather than establish a reasonable doubt of guilt. (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 281, 393 N.E.2d 1098.) These evidentiary discords are properly resolved by the jury and will not be set aside where, as here, there was more than enough evidence to sustain the verdict which was returned.

Appellant next argues that the trial court erred in refusing to tender to the jury a non-IPI instruction regarding self-defense. Defendant's instruction No. 2 read as follows:

"[T]hat if one who is not the first assailant is in a place where he has a lawful right to be and is put in apparent danger of his life or of suffering great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force even to the taking of his assailant's life."

The State objected to the instruction and the trial court refused to tender it.

•■■ Appellant correctly cites Supreme Court Rule 451(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 451(a)) in this regard. That rule reads as follows:

"Whenever Illinois Pattern Instructions in Criminal Cases (IPI-Criminal) contains an instruction applicable in a criminal case, giving due consideration to the facts and governing law, and the court determines that the jury should be instructed on the subject, the IPI—Criminal instruction shall be used, unless the court determines that it does not accurately state the law. Whenever IPI-Criminal does not contain an instruction on a subject on which the court determines that the jury shall be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument."

However, we disagree with his application of the rule in this case. Since the rule mandates the use of applicable IPI Criminal instructions and leaves it to the trial court's discretion as to when an instruction on a subject not covered in IPI Criminal shall be given, we will not set aside the trial court's exercise of discretion unless the same is abused. We note that during the instructions conference, the trial court simply stated, "I am

not going to give this, Mr. Meyer. Show this refused," when the State objected on the grounds, "Not in IPI." While no further explanation was given, we believe the trial court's decision was correct, given another instruction which was tendered to the jury.

The court gave, without objection by defendant, People's instruction No. 15, which was IPI Criminal No. 24.06 (1968). The instruction read as follows:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

Apparently defense counsel was not satisfied with this single instruction and requested that defendant's instruction No. 2 be given. However, we agree with the State that the refused instruction was but an "argumentative version" of IPI Criminal No. 24.06, and conclude that People's instruction No. 15 sufficiently presented appellant's version of the case.

■ We are mindful that a trial court abuses its discretion with respect to jury instructions if its "refusal to give an instruction results in the jury not being instructed as to a defense theory of the case which is supported by some evidence." (*People v. Hines* (1975), 28 Ill. App. 3d 976, 985, 329 N.E.2d 903.) And while we might agree that appellant's suggested instruction is a correct statement of the law, we believe that appellant's "defense theory" was properly before the jury vis-a-vis IPI Criminal No. 24.06.

©■■ Appellant further contends that he was denied a fair and impartial trial because of numerous instances of prosecutorial misconduct. The State initially argues that the following points have been waived by appellant's failure to object to them at trial and to specify them in his motion for a new trial. Appellant counters that most of these points were preserved for appeal through his allegations in the post-trial motion that he "did not receive a fair trial," "was denied due process of law," and "was denied equal protection of the laws." Section 116—1(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 116—1(c)) mandates that "the motion for a new trial shall specify the grounds therefor." We believe that this statute generally calls on counsel to specify with more particularity the grounds for his motion than appellant did here. But we are also cognizant of that body of law which holds that even though no objection was made at trial, a reviewing court may consider assignments of error relating to extremely prejudicial arguments and

conduct of counsel "which deprive the accused of substantial means of enjoying a fair and impartial trial * * *." (*People v. Howell* (1975), 60 Ill. 2d 117, 121, 324 N.E.2d 403; *People v. Manzella* (1973), 56 Ill. 2d 187, 195, 306 N.E.2d 16, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644; *People v. Richardson* (1977), 49 Ill. App. 3d 170, 172, 363 N.E.2d 924; *People v. Young* (1975), 33 Ill. App. 3d 443, 447, 337 N.E.2d 40.) Since appellant contended in his post-trial motion that he was denied a fair trial, we choose to decide this case on its merits so as to discuss the permissible bounds of prosecutorial conduct.

■■ Appellant argues that the prosecutor erred in asking him whether he lied during trial and to comment on the credibility of certain State's witnesses. First, we find no error with the State asking appellant, "Have you told any lies? * * * Have you told any lies today, Mr. Bost?" Appellant answered, "No, sir, I haven't. I have tried to be as truthful and honest as I could be." Since there were discrepancies in appellant's testimony and a witness' credibility is always at issue in a case, we find no error here.

■■ Appellant further points to the following episodes in arguing that the State engaged in improper questioning. The State had elicited testimony from two witnesses to the effect that they had seen appellant put his hand on the tavern door or open it before he shot at the victim. When appellant denied engaging in any such activity, the State replied, "Two witnesses saw you do that. Were they wrong?" Appellant responded, "Yes, sir. They were." The State contends that it can properly point up differences in the testimony of witnesses and ask one witness if another's testimony is wrong, citing *People v. Morse* (1975), 33 Ill. App. 3d 384, 342 N.E.2d 307. This court there held that asking if another witness was "wrong" or "mistaken" was allowable, since it did not force the defendant to judge the truthfulness of the witnesses which is, of course, prohibited. Therefore, such questioning was proper.

Again, the State asked appellant if the testimony of two other witnesses, to the effect that they heard him threaten another man, was wrong. Appellant replied, "I'm not only saying they're wrong. I am saying they told a wilful lie." As we will discuss below, the subject of the State's question was improper. Nonetheless, the State seems to rely on the answer to justify its questioning appellant as to whether other State's witnesses were liars and vice versa. The prosecutor asked appellant if Traylor, the off-duty State trooper, was "a liar too?" Appellant was asked if the victim threatened him. The answer was yes, to which the prosecutor retorted, "Everybody that was asked that question said that he hadn't threatened you." Appellant's wife was asked, "He [appellant] never lies?" Stansbury was asked, "If David Bost testified that you had threatened him

or he had been threatened by Mr. Lancaster in your presence would he be telling the truth?" The State contends that appellant questioned the credibility of its witnesses and that therefore such questioning was proper. We disagree.

● ■ The State admits that "eliciting an opinion that another witness is lying usurps the jury's function." The *Morse* case so held. Given that clear understanding, we are at a loss to explain why we are continually asked to review such improper tactics by the State prosecutor, especially after the Illinois Supreme Court's bristling mandate in *People v. Butler* (1974), 58 Ill. 2d 45, 51-52, 317 N.E.2d 35. It is more than well settled that "it is within the province of the jury to determine which witnesses, whose testimony conflicts, are telling the truth. [Citation.]" (*People v. Hicks* (1971), 133 Ill. App. 2d 424, 434, 273 N.E.2d 450.) Therefore, "[i]t is improper to ask a defendant's opinion concerning the veracity of other witnesses," and vice versa. (*People v. Riley* (1978), 63 Ill. App. 3d 176, 185, 379 N.E.2d 746.) However, it has also been held that such questions, "standing alone, although improper, were not prejudicial." (*People v. Meeks* (1973), 11 Ill. App. 3d 973, 980, 297 N.E.2d 705; *People v. Hill* (1978), 58 Ill. App. 3d 822, 826-27, 374 N.E.2d 1020.) Therefore, we find this improper questioning insufficient in and of itself, to mandate reversal, given the length of this trial, the numerous witnesses, and the otherwise convincing evidence of guilt.

Appellant's next assignment of error with respect to alleged prosecutorial misconduct involves the prosecutor's cross-examination of appellant as follows:

"Q. [Mr. Long] Did you ever tell a Mr. Wedekamp [*sic*] about carrying a gun under the seat of your motorcycle in the State of California and to use it to run people off your front porch?

A. Oh, come on now. To do what? Repeat that.

Q. Did you ever tell a coal miner by the name of Wedekamp [*sic*] you had a gun, pistol, under the seat of your motorcycle when you lived in California and you drew that gun out and ran three people off your front porch?

A. To run three people—

Q. MR. MEYER: Before you answer that, let me make an objection at this point, Your Honor. It would be totally irrelevant here. Has nothing to do with this case at all. No probative value. Beyond the scope of direct examination.

A. Never said it anyway.

MR. MEYER: Let me make this objection.

THE COURT: There hasn't been any time element established as to when this was. Think I'll sustain the objection."

The State admits that this cross-examination was "technically irregular," but suggests that it could not have been prejudicial because the court sustained the defendant's objection.

● It has long been recognized that evidence or suggestion of other crimes, unrelated to the charge being considered, is improperly introduced at trial. (*People v. Smith* (1952), 413 Ill. 218, 223; *People v. Decker* (1923), 310 Ill. 234, 243; McCormick, Evidence §190, at 447 (2d ed. 1972).) Therefore, we do not at all condone the asking of such a question. However, it is also well established that such error is not reversible where "the evidence so clearly and conclusively showed the defendants to be guilty that the court could say that such misconduct did not substantially prejudice the rights of the defendants." (*People v. Decker* (1923), 310 Ill. 234, 243.) We have already noted that the evidence in this cause was overwhelming and more than sufficient to sustain the verdict. Moreover, appellant voluntarily denied the State's accusation while his attorney was in the process of objecting; and defense counsel apparently did not deem the exchange so prejudicial to his client as to request that the testimony be stricken from the record and that the jury be charged to disregard it. Indeed, it is difficult to see how appellant was prejudiced by his response. Given the length of the trial, the number of witnesses, and the conclusiveness of the evidence, we find that the conviction should not be reversed because it does not appear that justice was denied or that the jury verdict may have resulted from such error. *People v. Spaulding* (1979), 68 Ill. App. 3d 663, 676-77, 386 N.E.2d 469; *People v. Ballard* (1978), 65 Ill. App. 3d 831, 842, 382 N.E.2d 800.

● Appellant also contends that the State improperly cross-examined him and his wife about their children being on welfare in California. The State, relying on *People v. Longstreet* (1971), 2 Ill. App. 3d 556, 276 N.E.2d 825, responds that the defense adduced evidence that appellant was the father of a two-year-old boy in order to prejudice the jury and that it could delve into the provider of care and support for him. This is a closer case than *Longstreet,* for there the defendant testified on direct that he was divorced but paid child support for his children. The State then properly cross-examined as to the amount of payment and whether his wife was receiving public aid, because defendant had initiated the inquiry on direct. In the present case, the appellant and his wife testified only to the existence of the child and his age. Still, it was appellant who initiated the inquiry into his children, and "[i]t is well established that a defendant cannot complain when, on cross-examination, the prosecutor pursues a line of inquiry which he initiates. [Citations.] Since defendant, in his direct testimony, touched on these subjects, cross-examination concerning them was proper." *People v. Clark* (1973), 9 Ill. App. 3d 998, 1003, 293 N.E.2d 666.

● ■ Appellant complains further that the State improperly asked him if he was guilty of murder or voluntary manslaughter. He contends that such questioning invaded the province of the jury, whereas the State responds that it had the right to seek a binding judicial admission, even though it admits the chances of one were slim. Undoubtedly, a defendant has a right to confess in open court. (*People v. Green* (1959), 17 Ill. 2d 35, 42, 160 N.E.2d 814, *cert. denied* (1960), 361 U.S. 972, 4 L. Ed. 2d 551, 80 S. Ct. 605.) It would follow then that the State could seek the same, so long as there was no coercion and that the confession was made under circumstances guaranteeing reliability. Moreover, appellant's objection was waived when, apparently as a matter of trial strategy, his counsel withdrew his objection to the question, "You feel you're guilty of any crime, Mr. Bost?" Appellant cannot now complain.

Appellant contends that the State violated his constitutional right to confront adverse witnesses by introducing the prior trial testimony of Sue Ellen Morgan during cross-examination, when she did not testify in this trial and there was no showing of her unavailability therefor. However, as the State correctly notes, it was appellant himself who opened up this matter on direct. It was he who initially testified, over the State's objection, that Sue Ellen Morgan told him "not to argue with him [Lancaster]." It was later during cross-examination that the State's attorney queried without objection: "And she denied she ever said that to you, didn't she?" Appellant replied: "Yes, sir, I believe she did." Again, on surrebuttal appellant's counsel questioned him as follows:

"Q. David, drawing your attention to the evening you were at the Uptown Tavern with Stansbury, Lancaster and Sue Ellen Morgan. That's the time I'm talking about. Did Sue Ellen Morgan come to this group and sit down?

* * *

Q. You told what conversation that she had with you. What was the tone of her voice when she talked to you?"

It was after such questioning that the State's attorney cross-examined as follows:

"Q. Isn't it a fact, though, Mr. Bost, that Mrs. Morgan testified under oath in your presence that she never said anything like that? MR. MEYER: Going to object to this, Your Honor. This is improper. It's irrelevant and immaterial. It's not correct cross-examination or proper cross-examination. She's not testified in this case at all."

■ We might tend to agree with appellant that this matter was improperly injected into the case by the State, if the State *ab initio* had catalyzed its admission. There was no showing that Mrs. Morgan was unavailable for this trial, and without such a showing, prior testimony is

not admissible. (*People v. Payne* (1975), 30 Ill. App. 3d 624, 332 N.E.2d 745.) But again, appellant initiated the inquiry as to these matters on direct, and he cannot now complain that the State responded to his improper questioning. The criminal defendant who takes the stand opens himself to legitimate cross-examination. *People v. Williams* (1977), 66 Ill. 2d 478, 487, 363 N.E.2d 801.

Appellant next contends that the State erroneously cross-examined two character witnesses about specific acts of misconduct (arrests) on his part and introduced a specific act in rebuttal. The episodes from cross-examination included the following, where the prosecutor was questioning Don Patton:

"Q. Is it your testimony though that Mr. Bost has an unblemished past record?

A. Yes. I do not know anything in his past that—He was always a gentleman and as far as anybody talk with [*sic*] he was a gentleman.

Q. Always law abiding?

A. Always law abiding."

While cross-examining witness Dennis Thomas, the State conducted the following interrogation:

"Q. Are you saying that by being a law abiding citizen he'd never been arrested or anything like that?

A. I don't remember him ever being arrested for anything since I have known him.

Q. Could he have been?

A. I don't see how it could happen. The coal mine is just like any other type deal. Gossip and rumors travel pretty easy and pretty fast. Just about anything that happens to a person, 600 people know about it the next day.

Q. You're not telling this jury you know what happened in Farmersville, Illinois on the 21st of December, are you?

A. Pardon.

Q. You're not telling the jury and court today you know what happened in Farmersville on the 21st?

A. I know what I read in the Belleville paper.

Q. Are you telling the jury that Mr. Bost didn't commit this crime?

A. I am not telling them anything. I was just shocked when I read it in the paper. Just disbelief. I couldn't believe it."

Appellant contends that such questioning involved particular acts of misconduct rather than evidence of bad character and was, therefore, improper. Appellant correctly observes that in the first instance, "evidence concerning a person's reputation as to peace and quiet, or as a law-abiding, orderly, peacable or quiet citizen is admissible where his

reputation in that respect is in issue." (5 Callaghan's Illinois Evidence §10.34, at 290 (1964), and cases cited therein; *People v. Fedora* (1946), 393 Ill. 165, 65 N.E.2d 447.) On the other hand, it is the general rule that testimony is inadmissible "as to particular acts or transactions for the purpose of showing bad character or rebutting proof of good character." (5 Callaghan's Illinois Evidence §10.22, at 277 (1964), and cases cited therein; *People v. Stanton* (1953), 1 Ill. 2d 444, 115 N.E.2d 630; *People v. Myers* (1968), 94 Ill. App. 2d 340, 236 N.E.2d 786.) This "is not permissible because of the risk of unfair surprise, undue prejudice, confusion of issues, and undue consumption of time involved in proving character by collateral events * * * ." Gard, Illinois Evidence Manual R. 99, Comment (1963).

● ■ We believe that such questions amounted to asking the witnesses whether they had knowledge of past bad acts by appellant and were therefore improper. (*People v. Greeley* (1958), 14 Ill. 2d 428, 432-33, 152 N.E.2d 825; *People v. Hermens* (1955), 5 Ill. 2d 277, 286-87, 125 N.E.2d 500.) This is particularly true of the State's questioning of Dennis Thomas with respect to his knowledge of the events which were the subject of this trial. He was not an occurrence witness but a character witness, and as such, he had no first-hand knowledge of the events surrounding the shooting. The State could not impeach his testimony by asking if he knew what happened and if he was telling the jury appellant was not guilty as charged, and this court does not countenance such tactics.

● 16 However, we note that such questioning did not evoke from defense counsel objections or a request that the jury be cautioned to disregard this line of testimony. Moreover, we repeat that the evidence against appellant was overwhelming. Therefore, while portions of the prosecutor's cross-examination were improper, we conclude that they did not constitute a material factor in the conviction and did not result in substantial prejudice to the accused. *People v. Manzella* (1973), 56 Ill. 2d 187, 200; *People v. Helm* (1968), 40 Ill. 2d 39, 46-47, 237 N.E.2d 433.

● ■ Appellant also contends that rebuttal testimony adduced by the State, to the effect that the two witnesses heard him threaten to harm the union president of the mine, was irrelevant and immaterial rebuttal which constituted erroneous introduction of a particular act of misconduct to the jury, and was compounded by the prosecutor's arguing during closing argument that it evidenced a violent nature. While defense counsel objected to such questioning, which objections were overruled by the trial court, he then pursued this line of inquiry on cross-examination of the two witnesses.

> "It has been held that where defendant objects to certain testimony on direct examination, but then questions the witness on cross-examination concerning the allegedly inadmissible testimony, any

error is waived for purposes of appeal. (*People v. Jenkins* (1974), 20 Ill. App. 3d 727, 734, 315 N.E.2d 269; *People v. Calvin* (1969), 116 Ill. App. 2d 471, 481, 253 N.E.2d 922.)" (*People v. Lewis* (1979), 75 Ill. App. 3d 259, 287.)

Since appellant pursued what might have otherwise constituted error, he cannot be heard to contest the point on appeal. Moreover, we fail to see how appellant was prejudiced by testimony which he later denied.

Appellant next argues that he was denied a fair trial because the victim's widow was called to identify certain exhibits, at which time she broke into tears on the stand. The contention is that she was called for the sole purpose of inflaming and prejudicing the jury. We cannot agree.

The deceased's wife was called to identify the victim's bloody clothing and a photograph of him lying dead on the floor of the bar, which she did. Defense counsel moved for a mistrial on the grounds that the clothing and picture had already been sufficiently identified to be admitted as evidence and that her testimony was for the sole purpose of inflaming the jury. The trial court denied the motion. The prosecutor then announced he had no more questions for Mrs. Lancaster and defense counsel renewed his motion for a mistrial which was again denied. The prosecutor then questioned the witness about the deceased's knowledge, use, and possession of firearms. Appellant argues that these matters were introduced as an afterthought based on his objection, while the State responds that the prosecutor simply forgot to ask them because of the intervening defense motions and arguments and rulings thereon.

● ■ Both parties agree that the breakdown of a witness on the stand does not itself constitute prejudicial error. (*People v. Hudson* (1970), 46 Ill. 2d 177, 263 N.E.2d 473.) Nothing more than that happened here. The witness was called to identify physical evidence and a photograph to establish that the victim had, in fact, been killed. While appellant argues that the clothing had been sufficiently identified by prior witnesses, he subsequently objected to their admission into evidence because an allegedly insufficient foundation had been laid for their introduction. Thus, the defense cannot contend, on the one hand, that the witness' testimony was merely cumulative, while arguing on the other that even with such testimony an inadequate foundation for their admission had been laid.

● ■ Appellant agrees that the State can call "life and death" witnesses to establish the identity of the victim and the fact of his death. This witness' testimony was important to the State's case since it helped establish a sufficient foundation in the eyes of the trial court to admit the photograph into evidence. We cannot speculate how the court would have ruled without such testimony. It has long been the law in Illinois that "when a trial is upon a plea of not guilty the State is permitted to go ahead and

introduce its *full proof* of the crime charged in the indictment." (*People v. Scheck* (1934), 356 Ill. 56, 62, 190 N.E. 108.) (Emphasis added.) The only limitation seems to be that when such proof is offered through relatives, that there be no undue emphasis that the victim left a surviving family. (*People v. Jordan* (1967), 38 Ill. 2d 83, 230 N.E.2d 161; *People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436.) This being the case, we find no error in the widow's testimony. Her appearance was short, her emotions were visible but not offensively so, and the circumstances of the surviving family were not embellished or dwelled upon. In this context we find appropriate the following language from *People v. Hudson*:

> "Defendant asserts that he was prejudiced by the fact that the deceased's wife was emotionally upset when she gave her testimony. Counsel for the defendant made a motion for a mistrial at the conclusion of her testimony on the ground that the witness was sobbing and crying throughout her testimony * * *. The court denied a motion for mistrial. This court has pointed out that on a plea of not guilty the State has the right to prove every element of the crime * * *. [Citation.] The witness's testimony was brief and was elicited to prove the identification of the decedent and his death. There was no attempt to obtain the jury's sympathy by dwelling at length upon the fact that the deceased left a family, a practice which has been condemned by this court. (*People v. Bernette*, 30 Ill. 2d 359.) We are of the opinion that the fact that the widow was emotionally upset does not constitute prejudicial error requiring reversal." 46 Ill. 2d 177, 196-97.

Appellant finally contends numerous errors were committed by the State in closing argument. Initially he points out that the prosecutor characterized him as a "liar" in his version of the events and his testimony as "lies." It is well settled that such argument is improper unless it is based on evidence in the record and legitimate inferences therefrom. (*People v. Mitchell* (1975), 35 Ill. App. 3d 151, 164, 341 N.E.2d 153.) A review of the record shows that defendant's version of the events surrounding the shooting were controverted by virtually every State's witness. No one corroborated appellant's testimony that he heard someone say, "He's got a gun," prior to the time he fired. Nor did anyone confirm his statement that the victim was still standing when he left the premises. Additionally, the State points out a direct discrepancy in that appellant testified he was not introduced to Officer Traylor as a State trooper until several hours after he was arrested, whereas the evidence was clear that Traylor, after identifying himself as a police officer, initially arrested him. There were other instances of conflicting testimony and prosecutorial comment thereon, but they need not be recounted here. They were relatively few and far between, given the length of the trial and the closing arguments.

Such references were in no way comparable to the situation in *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, cited by appellant, where the prosecutor went on a rampage of impermissible commentary after numerous objections and rulings and warnings by the court. While there was some evidence of differences of opinion in the present case, the testimony as it appears in the record leads us to conclude that the prosecutor's remarks were based on justifiable inferences deduced from the evidence. As such, they did not prejudice the jury.

● ■ Appellant also asserts that the prosecutor made certain remarks during closing argument which were not based on the evidence. The State admits one such error, that being the prosecutor's allegation that Ray Stansbury was present when Lancaster allegedly threatened appellant with a hammer. In reality, appellant testified that Stansbury was not present during that threat. We find such error to be *de minimis* in light of the length of the trial and the probable minimal part it played in the jury's decision. The comment was made during closing argument, and the jury was instructed that such arguments were not evidence in the case and were not to be taken as such. Appellant was thoroughly protected by such instruction in this instance.

While appellant points to other alleged instances of unsupported comments, he admits that such constitutes reversible error only when the evidence is highly conflicting. (*People v. Thomas* (1975), 25 Ill. App. 3d 88, 92, 311 N.E.2d 597.) This is not to say that a defendant who is confronted with a case of overwhelming evidence against him is entitled to a less fair trial than one who is not so confronted. On the contrary, the lodestone of the constitutional right to trial is that every individual, guilty or innocent, is entitled to a fair trial. (*People v. Stock* (1974), 56 Ill. 2d 461, 472, 309 N.E.2d 19; *People v. Rongetti* (1928), 331 Ill. 581.) But under the circumstances of a particular case, what may be prejudicial in one trial may not be so in another. Therefore, the other purported instances of error, *i.e.*, the prosecutor's charge that appellant gave no warning prior to firing, that his gun was held in such a way as to be inconspicuous to the victim, the description of his actions as "luring" Lancaster toward him, the scenario that Lancaster would have had to unsnap his jacket pocket to pull out a gun as alleged by appellant, the argument that appellant bought a gun that could not be traced, and the effect of Sue Ellen Morgan's testimony (as discussed above), were all either supported by the evidence or were fair inferences therefrom and explained by the prosecutor as such, save one. That comment was that Ray Stansbury "tried to be friendly to Mr. Bost because he was a new coal miner there at the mine." While there was no evidence in the case to support such a statement, we do not view it as prejudicial to appellant under the circumstances of this case.

Appellant alleges that additional irrelevant and prejudicial comments

were made by the prosecutor during closing argument. He first points out that the rebuttal testimony regarding the prior threat against the union president was highlighted by the State. But as noted above, this point was the subject of examination by both parties. Appellant cannot now complain that he was prejudiced as the result of the trial tactics which he too engaged in.

●■ Appellant also claims that the following argument presented by the State was erroneous: "Mrs. Bost * * * worked in two taverns, one included that sells guns, Sir Arthur's." The testimony which appellant in fact presented was that while in Sir Arthur's he approached one man about purchasing the gun who referred him to the individual from whom he finally bought it. The jury heard this testimony for itself, and the instruction of the court that closing arguments of the attorneys are simply that and not evidence. In this light, we do not believe that appellant was prejudiced by this argument.

●■ Likewise, we do not conclude, as urged by appellant, that the State erroneously portrayed the basis of Mrs. Bost's testimony as being for sympathy. The prosecutor commented during closing argument:

> "Mr. Bost also had his wife on the stand. She didn't add much. She came up with he was frightened on a Thursday and she didn't know why before he killed Mr. Lancaster on the 21st, was a Tuesday. The Thursday before that was the 17th [*sic*]. She says he's home that night and all day. He says he's down at someplace called Sir Arthur's buying a gun. Somebody is not telling the truth. She is up here to get your sympathy. She doesn't know anything about the occurrence. She's got him home when he's out buying a gun."

We believe such a characterization of her testimony is a legitimate inference based on the evidence. Moreover, the prosecutor did not overemphasize this point or unduly dwell on it. There was no error here.

●■ Appellant next contends that the prosecutor gave his personal opinion as to appellant's guilt, and that such constituted error. The disputed comment was as follows:

> "If you will remember, at the beginning of the trial I told you we would prove the defendant guilty beyond a reasonable doubt of the offense of murder. I think we have done that. We accomplished our task."

We do not consider this an improper comment. The prosecutor did not express his personal opinion as to appellant's guilt. He simply argued his belief that a conviction was warranted under the evidence, an argument he has a right to make. It is clear that this argument was based on the evidence which had been presented. (*People v. Williams* (1962), 26 Ill. 2d 190, 193, 186 N.E.2d 353.) Moreover, defense counsel seemed to approve

of the statement since in his closing argument he said: "He [the State's Attorney] must prove his case beyond a reasonable doubt. Now I am sure he is going to tell you he's done that. Already told you he done that as far as that is concerned." No error was committed.

Likewise, it was not error for the prosecutor to urge the jury to not let appellant "go loose on the streets." The State was not "making predictions of the consequences of the jury's verdict" (ABA Standards, The Prosecution Function §5.8 (approved draft 1971)), as alleged by appellant, but was rather discussing the evil results of the crime, commenting on the conduct of the accused, and urging a fearless administration of the criminal law. Such arguments are properly within the scope of the State's closing argument. *People v. Williams* (1962), 26 Ill. 2d 190, 194; *People v. Provo* (1951), 409 Ill. 63, 71.

●■ Appellant also points out that the prosecutor commented on the fact that certain evidence was not presented during his retrial and that the State was not allowed to put on character witnesses against him. The State admits impropriety with respect to the first point, but argues that it was harmless. The second is a clear misstatement of the law, for once the defendant introduces evidence of his good character, the State may introduce evidence in rebuttal. (*People v. Holt* (1947), 398 Ill. 606, 613.) However, these errors occurred during closing argument, and as an appellate court we must determine whether the objectionable remarks influenced the verdict of the jury. (*People v. Davis* (1970), 46 Ill. 2d 554, 560, 264 N.E.2d 140.) We do not find, based on overwhelming evidence against appellant in the record, that he suffered substantial prejudice by these comments, or that they constituted a material factor in the conviction. (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363; *People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) For these reasons, we are of the opinion that we would not be justified in reversing the judgment of the circuit court.

Appellant's final specific contention regarding closing argument is the prosecutor's reference to the change of venue in this case. The comment was:

"I hope and trust—know this offense didn't occur in your county, it occurred in our's [*sic*]—you won't let this man go loose on the streets."

Appellant contends that *People v. Munday* (1917), 280 Ill. 32, supports his theory that this was error, while the State counters that the comments in *Munday* were much more blatant than those here. In *Munday* the prosecutor "referred to the fact that a change of venue had been taken from Cook county to Grundy county and that plaintiff in error had not the

courage to face the many persons he had defrauded in Cook county." (280 Ill. 32, 49.) The supreme court then noted:

> "Generally it is error for the prosecution to refer to the fact that a defendant has secured a change of venue from the county in which the crime is alleged to have been committed. The court determines, after a showing has been made, whether or not a change of venue should be granted, and it must be presumed when a change is granted that such action was necessary in order to secure for the defendant a fair trial." 280 Ill. 32, 49.

● ■ Not only is the character of the comment in this case more innocuous than the one in *Munday,* but it must be considered in light of numerous other remarks throughout the entire trial. The record is replete with references to appellant's first trial, such as: "Now were you present during the last trial?" "Were you present when Sue Ellen Morgan testified?" "So your testimony last time, last trial was incorrect in that regard?" "You heard them all testify twice didn't you?" "Mr. Gorman didn't testify before. He testified in this case"; and "I heard that in the last trial also." It is evident that the jury was well aware another trial of this defendant had occurred. Given that fact, we cannot say appellant was denied a fair trial because of this passing remark regarding place of trial.

● ■ Appellant suggests that even if we do not find any of the alleged prosecutorial errors to be reversible in and of themselves, their cumulative effect worked to his prejudice. However, these incidents in neither their singular nor cumulative form were prejudicial. Appellant is entitled to a fair and impartial trial, and he was accorded that right. While certain errors were committed, a review of the entire record does not evidence the "calculated pattern of misconduct" suggested by appellant. Therefore, we decline to reverse this case because of the actions of the prosecutor.

Appellant finally contends that the trial court abused its discretion in sentencing him to 6 to 18 years' imprisonment and asks that the sentence be reduced to 1 to 3 years. He argues, based on *People v. Short* (1978), 66 Ill. App. 3d 172, 383 N.E.2d 723, that the trial court improperly considered the testimony of Trooper Huggins and Mrs. Lancaster, the victim's wife, presented by the State during the sentencing hearing. In *Short,* the State had offered the testimony of the chief deputy sheriff of the county, the local postmaster and fire chief, the local assistant fire chief, and the two victims of the criminal damage to property there at issue in aggravation at the sentencing hearing. This court in *dicta* criticized the parade of prominent members of the community as to their opinions on the sentence to be imposed.

However, *Short* is inapposite here. The State presented Trooper

Huggins, who was one of the investigating officers in this case. He testified that probation in any voluntary manslaughter case would deprecate the seriousness of the offense and that every person should receive a minimum of 5 to 6 years' imprisonment for such a conviction. This testimony was a direct response to the procession of eight witnesses, including appellant and his wife, in mitigation, who testified to one ultimate conclusion—that appellant should receive probation for this offense. The six men who so testified based this conclusion mainly on their employment relationship with him for various lengths of time. The State can hardly be faulted under these circumstances for responding with two witnesses who rendered opinions contrary to those who testified in mitigation. The testimony of Trooper Huggins does not come close to the parade of horribles we discussed in *Short*. Nor does the testimony of Mrs. Lancaster represent the enlistment of public clamor for stricter sentences which we criticized there.

●■ ■ As noted earlier, the trial court stated that it considered the presentence reports and the two supplements thereto, all of the testimony adduced at the sentencing hearing, the arguments of counsel, as well as the evidence in the case. Then the court determined that, based on the seriousness of the offense, the aforesaid sentence should be imposed. Therefore, appellant's argument that the trial court gave more credence to the serious nature of the crime than to his rehabilitative prospects is without merit on this record. The trial court is to consider both of these factors, which it did, and not one to the exclusion of the other. (*People v. Waud* (1977), 69 Ill. 2d 588, 595-96, 373 N.E.2d 1.) The trial court did not abuse its discretion in issuing the sentence it did. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Appellant has not rebutted the presumption that the trial court acted properly, nor made the necessary affirmative showing that the sentence was erroneous in his particular case. (*People v. Choate* (1979), 71 Ill. App. 3d 267, 389 N.E.2d 670.) Therefore, appellant's sentence is affirmed.

For the foregoing reasons the judgment of the circuit court of Montgomery County is affirmed.

Judgment affirmed.

JONES, P. J., and KASSERMAN, J., concur.